# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3348

_____

| | | |
|---|---|---|
| Mary Buettner, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Missouri |
| Arch Coal Sales Co., Inc. and | * | |
| Arch Coal, Inc., | * | |
| | * | |
| Defendants-Appellees. | * | |
| | * | |

_____

Submitted: April 10, 2000
Filed: June 26, 2000

_____

Before BOWMAN and HANSEN, Circuit Judges, and
        CARMAN*, Chief Judge, U.S. Court of International Trade.

_____

CARMAN, Chief Judge.

    Appellant, Mary Buettner (Buettner), appeals from the order of the United States

_____

    * The Honorable Gregory W. Carman, Chief Judge of the United States Court
of International Trade, sitting by designation.

District Court for the Eastern District of Missouri (Jackson, J.) dated July 21, 1999, granting summary judgment in favor of appellees, Arch Coal Sales Co., Inc. and Arch Coal, Inc., and denying Buettner's retaliation and wage discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, and the Missouri Human Rights Act (MHRA), MO. REV. STAT. §§ 213.010-.095. We affirm.

## I.  BACKGROUND[1]

Appellant, Mary Buettner, an attorney, was hired in March 1993 by appellee, Arch Coal, Inc. (AC)[2], to work in the newly created position of Vice President, Secretary, and General Counsel for co-appellee, Arch Coal Sales, Inc. (ACS), a wholly-owned subsidiary of Arch Coal, Inc. (collectively Arch Coal). Steven Carter, AC's Executive Vice President, and Jeffrey Quinn (Quinn), AC's General Counsel, interviewed and hired Buettner because they determined there was sufficient legal work to justify assigning a full time attorney to ACS. Patrick Panzarino (Panzarino), ACS's President, disagreed. Quinn testified he believed ACS was "disorganized" and that he "forced" Panzarino to accept Buettner's employment at ACS. By virtue of her position, Buettner was required to report directly to Panzarino. The record demonstrates Panzarino and Buettner had a contentious working relationship.

---

[1]  Apparently prior to the district court's order granting summary judgment in favor of the appellees, Arch Coal Sales Co., Inc. (ACS) and Arch Coal, Inc. (AC) (collectively Arch Coal), appellant, Mary Buettner (Buettner), amended her complaint to remove allegations that she and other women in defendant's employ were subject to a hostile work environment. *See Buettner v. Arch Coal Sales Co., et al.*, No. 4:97CV1926, at 2 n.2 (E.D. Mo. July 21, 1999). As that allegation is moot and not raised before this Court, we focus our description of the factual background on facts pertinent to Buettner's retaliation and wage discrimination claims only.

[2]  During appellant's employment, Arch Coal, Inc. was known as Arch Mineral Corporation. For the purposes of this opinion, the Court will refer to the parent corporation as Arch Coal, Inc.

The first serious dispute between Panzarino and Buettner occurred in October 1994 regarding the secretary Panzarino assigned to Buettner. According to Buettner, Panzarino was very angry about her objection to the secretary assignment and told Buettner her services were no longer required at ACS. Buettner testified three different employees told her that Panzarino instructed them not to send work to her after this incident. Panzarino testified that he never purposefully deprived Buettner of work. Buettner testified her work load gradually decreased after October 1994.

In December 1994, Buettner e-mailed Quinn that Panzarino had cut off contact with her and that his staff was writing its own legal correspondence. Buettner told Quinn she was determined not to let Panzarino force her out of her job. Quinn completed Buettner's annual evaluation which Panzarino had refused to complete in March 1994.

On March 17, 1995, Buettner e-mailed Quinn and asked him whether Panzarino was scheduled to conduct her annual review. She asked how fair a review would be from "a man who has barely spoken to [her] in the past five months and who has said that he doesn't want [her] [at Arch Coal Sales] anymore and that he doesn't think he wants [her] doing [Arch Coal Sales] work anymore." Also, Buettner stated her concern that if Panzarino did her reviews from then on, "who [would] make sure [she didn't] . . . fall so far behind the male attorneys in salary that the only way to catch up [would be] to leave?"

Buettner asserted that sometime during the summer of 1995, a co-worker, Jennifer Russell, resigned in frustration at being passed over for promotion. Buettner testified she told Quinn that Panzarino said to Russell it was "just as well that she was leaving, because women and minorities don't belong in the coal business." Quinn said he would investigate. Quinn reported to Buettner that he spoke with Panzarino and that Panzarino actually said that women and minorities "can't succeed" in the coal industry. Buettner told Quinn she found that remark even more offensive.

In June 1995, Buettner wrote Panzarino a memo stating that an increasing number of ACS agreements were being signed without her review and that employees were seeking legal advice from AC. She requested they stop doing so.

On or about June 15, 1995, Buettner and Panzarino disagreed about whether Buettner was to attend a meeting with a client. Panzarino stated in a memo drafted by him on June 19, 1995, Buettner was not invited to the meeting as the client only requested Panzarino and John Eaves attend the meeting. According to the June 19, 1995, memo, Buettner contacted the client's attorney and arranged to join the meeting without informing Panzarino.

Panzarino's memo also states that after a meeting called by Buettner, she requested an opportunity to discuss with Panzarino her role at ACS. Buettner and Panzarino agreed that they would ask Quinn and Carter to clarify Buettner's role. On June 15, 1995, Buettner e-mailed Quinn and requested that he, Carter, Panzarino, and she meet to resolve the differences between Buettner and Panzarino. In her e-mail, Buettner insinuated that Panzarino had told her that she was "too aggressive."

Joe Stearman, a member of the Arch Coal Sales staff, testified that he and Buettner had discussed the corporate reorganization that was underway in 1995. Stearman testified that in June 1995[3], Buettner told him that Panzarino was unhappy with him and might remove him from his job. Stearman confronted Panzarino. Panzarino was furious with Buettner and viewed her discussion with Stearman as a violation of a confidence. Buettner testified that Panzarino told her to pack her things and leave the building.[4] Buettner denied in her deposition that a specific event

---

[3] It appears from the record that this incident occurred on or about June 16, 1995.

[4] These facts describe the alleged June 16, 1995, "firing."

provoked Panzarino's action and asserts she never disclosed confidential information communicated to her by Panzarino. There is some dispute whether Panzarino fired Buettner, but all parties appear to agree that later in the day, Buettner spoke with Steve Leer, the President and Chief Executive Officer (CEO) of AC, who reassured her she was not fired. Buettner did not leave her employment and did not lose any pay or other benefits as a result of the action.

On June 22, 1995, Buettner met with Jane Fox, the Director of Personnel Services, and Mike McKown, the Vice President of Human Resources. The director wrote in a memorandum on that same date that she believed the problem to be "communication related compounded by personality conflicts." The director also attested in an affidavit that at the meeting Buettner "stated that there were no issues of sexual harassment." According to Buettner, when the director asked her whether Panzarino "ha[d] a problem with women," she responded affirmatively. Fox and McKown testified, and Buettner does not appear to contest, that they did not communicate the content of the meeting to Quinn.

In late 1994 or early 1995, AC's President decided to embark on a re-engineering of the corporation as Arch Coal's performance did not meet expectations in 1994 and hired a consulting firm, Arthur Andersen & Co., LLP (Andersen), to do the job. Ultimately, there was a reduction in force by 17.7% of the workforce at AC and its subsidiaries, including Panzarino and Buettner.

During the re-engineering, Quinn requested that someone with expertise in evaluating legal functions separately conduct the review for the legal department. In March 1995, the company retained Cindy Munger of Altman Weil Pensa to review the legal department.[5] Munger and Quinn worked together closely, and the record contains

---

[5] At some point during the re-engineering of Arch Coal, Cindy Munger left Altman Weil Pensa to work as a legal consultant for Arthur Andersen & Co., LLP

many documents prepared at different stages of the review process. Quinn's primary objective was to reduce costs. Thus, Quinn wanted to determine whether some of the legal work could be assigned to paralegals and less experienced attorneys.

In March 1995, Arch Coal had three attorneys responsible for commercial contract legal work: Buettner in coal sales agreements and transportation; Wayne Bussell (Bussell) in general commercial contracts; and Anne O'Donnell (O'Donnell) in real estate contracts. Bussell was hired in 1988, and O'Donnell, like Buettner, was hired in 1993. In September 1995, Bussell earned $100,980.00 plus a bonus; Buettner earned $78,224.00 plus a bonus; and O'Donnell earned $56,210.00 and was not eligible for a bonus.

Quinn decided to remove two of the three commercial attorneys. He selected Bussell and Buettner. O'Donnell assumed the work of Buettner and Bussell in addition to her own. Quinn testified in deciding whether to retain Buettner or O'Donnell, he considered the consolidated position to be "more junior" to Buettner's current position. The record reflects in January 1996 after O'Donnell assumed her additional work, her salary increased to $64,000—still less than Buettner's salary at the time of her discharge, $78,224. Quinn also testified that while Bussell was offered a nonlegal position elsewhere in the company, Buettner had told Quinn she was not interested in work other than coal sales. Buettner asserts she told Quinn her top priority was to be employed. Buettner was laid off in September 1995.

---

(Andersen). *See* Appendix at 173. Arch Coal continued to employ Munger as a legal consultant with Andersen. *See id.*

Buettner also claims she was discriminatorily paid less than a similarly situated male attorney, Bob Jones. Buettner testified that around the time she was hired, Quinn told her she would be receiving less money than Bob Jones, another 1987 law school graduate. Buettner testified Quinn told her that he would "catch [her] up" to Bob Jones. Quinn testified he told Buettner he would expect over time the gap between Buettner and Jones would decrease as Buettner's performance was proven and her responsibilities increased.

Unlike Buettner, Jones had a degree in mining engineering and worked as a mining engineer for five years before going to law school. Jones was hired to work at Arch Coal on or around August 1, 1991. When Buettner was hired, Jones was the company's chief labor attorney and handled employment law and safety matters. Jones also supervised another attorney. At some point, Jones had primary responsibility for litigation in the company.

## II. STANDARD OF REVIEW

We review a grant of summary judgment de novo. *See Bailey v. U.S.P.S.*, 208 F.3d 652, 654 (8th Cir. 2000). The question before the district court, and this court on appeal, is whether the record, when viewed in the light most favorable to the non-moving party, shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *See, e.g., Crain v. Board of Police Comm'rs*, 920 F.2d 1402, 1405-06 (8th Cir. 1990).

## III. DISCUSSION

### A. Retaliation

Buettner claims Arch Coal unlawfully retaliated against her by "firing" her on June 16, 1995, and by terminating her in September 1995 for expressing a belief that her employer had engaged in discriminatory acts. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, makes it unlawful for an employer to discriminate against an employee, for among other things, "because [s]he has opposed any practice made an unlawful employment practice by this subchapter." In the absence of direct evidence of discrimination, the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to claims of retaliation. *See Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir. 1980); *see also Cobb v. Anheuser Busch, Inc.*, 793 F. Supp. 1457, 1489 (E.D. Mo. 1990). Under the burden-shifting analysis, the plaintiff must first establish a prima facie case of retaliatory discrimination. *See McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case of retaliatory discrimination, a plaintiff must show: (1) she engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection existed between participation in the protected activity and the adverse employment action. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc), *cert. denied*, 120 S. Ct. 59 (1999). The same standards apply to MHRA retaliation claims. *See Cross v. Cleaver*, 142 F.3d 1059, 1076 (8th Cir. 1998).[6]

---

[6] Neither Buettner nor Arch Coal alleges the applicable law in this case should be the law of a "reduction in force" cause of action. *See, e.g., Herrero v. St. Louis Univ. Hosp.*, 109 F.3d 481, 483-84 (8th Cir. 1997). Rather, Buettner's sole argument regarding her termination is that she was terminated because she expressed her belief that her employer had engaged in discriminatory acts. Buettner does not claim that she was terminated because of her age, race, or ethnic origin, as required for a "reduction in force" cause of action. *See id.* Therefore, this Court will not apply a "reduction in

Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to produce some legitimate, non-discriminatory reason for the adverse action. *See Womack*, 619 F.2d at 1296. If the employer satisfies this burden, the plaintiff must prove the proffered reason is a pretext for retaliation. *See id.* Ultimately, the plaintiff must establish the employer's adverse action was based on intentional discrimination. *See Ryther v. KARE 11*, 108 F.3d 832, 837-38 (8th Cir. 1997) (en banc) (applying the *McDonnell Douglas* burden shifting analysis in an age discrimination case).

A finding of unlawful retaliation, however, is not conditioned on the merits of the underlying discrimination complaint. *See generally Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir. 1986). Title VII's prohibition against retaliatory discrimination protects activities ranging from filing a complaint to expressing a belief that the employer has engaged in discriminatory practices. *See, e.g., Wentz v. Maryland Casualty Co.*, 869 F.2d 1153, 1154-55 (8th Cir. 1989) (applying the approach taken under Title VII to claim of retaliatory discharge under the Age Discrimination in Employment Act). A plaintiff need not establish the conduct which she opposed was in fact discriminatory but rather must demonstrate a good faith, reasonable belief that the underlying challenged conduct violated the law. *See id.* at 1155.

Regarding the first prong in her prima facie case for retaliation, protected activity, sufficient evidence appears to exist on which a jury could reasonably believe Buettner engaged in protected activity. While it is unclear whether any of the statements on which Buettner relies to prove she engaged in protected activity

force" analysis in this case.

actually would constitute evidence of discrimination[7], Buettner must only demonstrate a good faith, reasonable belief that the underlying challenged action violated the law. *See id.* In viewing the record in the light most favorable to the non-moving party, we believe a jury could find Buettner had a good faith, reasonable belief that at least one of the statements she relayed to Quinn violated the law. Specifically, Buettner stated in her deposition of July 24, 1998, that she thought it was "very discriminatory [for Panzarino] to say that women and minorities don't belong in the coal business." Appendix at 445. Without determining whether Panzarino's comment would be sufficient to prove discrimination, we believe Buettner could demonstrate a good faith, reasonable belief that the challenged conduct violated the law.

Regarding the second prong, adverse employment action, we agree with the district court that Buettner failed to show any materially adverse employment action with regard to the June 16, 1995, "firing." Employment actions which do not result in changes in pay, benefits, seniority, or responsibility are insufficient to sustain a retaliation claim. *See, e.g., Flannery v. Trans World Airlines, Inc.*, 160 F.3d 425, 428 (8th Cir. 1998).[8] Here, Buettner does not offer any evidence that the

---

[7] Buettner cites the following facts to support her argument that she engaged in protected activity: (1) on March 17, 1995, Buettner wrote to Jeffrey Quinn (Quinn) regarding her concern that Panzarino would not conduct a fair evaluation of her and that she might fall behind male employees in salary; (2) on June 15, 1995, Buettner e-mailed Quinn implying Patrick Panzarino (Panzarino) called her "too aggressive"; (3) Buettner complained to Quinn that Panzarino made a discriminatory comment to co-worker, Jennifer Russell; and (4) Buettner told Jane Fox, Director of Personnel Services, and Mike McKown, Vice President of Human Resources, on June 22, 1995, that Panzarino had a "problem with women."

[8] Citing *Keeney v. Hereford Concrete Products, Inc.*, 911 S.W.2d 622 (Mo. 1995) (en banc), Buettner argues the Missouri courts define retaliation under the Missouri Human Rights Act (MHRA) more broadly than under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, and, therefore, at minimum, under the MHRA, Panzarino's attempt to fire Buettner in June 1995 constitutes a retaliatory

-10-

confrontation with Panzarino resulted in any materially significant disadvantage to Buettner. Indeed, she retained her job with ACS. Thus, Buettner's claim of retaliation with respect to the June 16, 1995, confrontation does not survive summary judgment. Buettner's termination in September 1995, however, unquestionably constitutes adverse employment action.

Regarding the third prong, causal link, we agree with the district court that it does not appear Buettner has shown evidence of a causal link between her complaints of discrimination and her dismissal in September 1995. First, there may be a question of fact whether Quinn knew that Buettner's statements to him constituted protected activity. A plaintiff must show the employer had actual or constructive knowledge of the protected activity in order to establish a prima facie case of retaliation. *See Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 818 (8th Cir. 1998) (citing *Simon v. Simmons Foods, Inc.*, 49 F.3d 386, 389 (8th Cir. 1995)). One of Buettner's strongest factual assertions concerns Panzarino's statement regarding women and minorities in the coal business.[9] Buettner stated in her deposition testimony on July 24, 1998,

act under Missouri law. This Court, however, has interpreted *Keeney* narrowly and has determined there is effectively "[no] difference between proof that there was a causal connection between the employee's protected activity and adverse employment action, the remaining elements of a Title VII retaliation claim, and proof that 'as a direct result [of protected activity], [the employee] suffer[ed] any damages due to an act of reprisal,' the second element of a retaliation claim under the MHRA." *Cross v. Cleaver*, 142 F.3d 1059, 1076 (8th Cir. 1998) (quoting *Keeney*, 911 S.W.2d at 625-26). Thus, we find Buettner's argument regarding the breadth of the MHRA unpersuasive.

[9] Buettner also argues the following incidents lead to an inference that her employer knew she was complaining of discriminatory behavior: (1) Buettner's e-mail to Quinn that she was concerned she would "fall so far behind the male attorneys and [*sic*] salary that the only way to catch up [would be] to leave," Appendix at 101; (2) Buettner's statement that Quinn in Buettner's initial job interview told her he would even her salary with that of Bob Jones, like Buettner, a 1987 law school graduate; (3)

that she told Quinn she felt Panzarino's statement concerning women and the coal industry was an indication of discrimination.  *See* Appendix at 445.  Quinn, in his affidavit signed on February 12, 1999, denies understanding any comments by Buettner as being complaints regarding discrimination.  *See* Appendix at 250.  Thus, it appears there may be a question of fact regarding Quinn's knowledge that Buettner had engaged in protected activity.

Notwithstanding there may be a question of fact regarding whether Quinn had knowledge of the protected activity, Buettner appears not to proffer sufficient evidence of a causal link between her complaints of discrimination and her dismissal that would preclude  summary judgment.  The requisite causal connection may be proved circumstantially by showing the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive.  *See, e.g., Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1090 (8th Cir. 1992).  Here, Buettner's primary evidence of a causal connection was that Panzarino had said that all the "troublemakers" would be let go in the reorganization.  Buettner, however, proffers no evidence that persons who complained about illegal procedures were considered "troublemakers" nor that Buettner herself had been called a "troublemaker."  The only other evidence to which Buettner can point from which a jury might infer a causal connection is the closeness in time between her complaints of gender discrimination in pay and working conditions beginning in December 1994 through her last significant complaints in June 1995 and her termination in September 1995. Generally, however, more than a temporal connection between protected activity and an adverse employment action is required to show a genuine factual issue on retaliation exists.  *See Kiel*, 169 F.3d at 1136; *see also, e.g., Feltmann v. Sieben*, 108 F.3d 970, 977 (8th Cir. 1997) (in Title VII retaliatory discharge claim plaintiff fired

Buettner's e-mail to Quinn inferring Panzarino criticized her for being "too aggressive"; and (4) Buettner's statement to human resources that Panzarino "had a problem with women."

six months after the complaint; without more, temporal proximity found to be insufficient to show causal link)[10]; *Nelson v. J.C. Penney Co., Inc.*, 75 F.3d 343, 346-47 (8th Cir. 1996) (plaintiff fired a month after he filed age discrimination charge failed to establish causal link without evidence in addition to temporal proximity); *Caudill v. Farmland Indus., Inc.*, 919 F.2d 83, 86-87 (8th Cir. 1990) (closeness in time between plaintiff's filing of charges and plaintiff's discharge was a mere "slender reed of evidence"; any conclusion of temporal proximity would be "rank speculation").[11] We decline, however, to determine specifically at this time whether temporal proximity alone would be sufficient to create an inference of a causal connection in this case as Buettner's failure of proof is even more obvious when we focus on the pretext stage of the *McDonnell Douglas* inquiry.

In support of Arch Coal's motion for summary judgment, Arch Coal submitted evidence of a legitimate, non-discriminatory reason for Buettner's discharge—as a result of a reduction-in-force for reducing costs and improving efficiency. Arch Coal's claim that the decision to eliminate Buettner's position was for reducing costs and increasing efficiency is supported by evidence of a determination made during

[10] Similarly, in a cause of action for retaliatory discharge under Missouri law in the same case, the Court found where only six weeks had passed between report of forged checks and the plaintiff's discharge, temporal proximity alone was insufficient to establish a causal link between plaintiff's complaint and her discharge.

[11] This finding is not contradicted by this Court's recent decision in *Bassett v. City of Minneapolis*, No. 99-1147, 2000 WL 371135 (8th Cir. April 12, 2000). In *Bassett*, the court determined a causal connection existed sufficient to create an inference of retaliation in a summary judgment motion where, in addition to temporal proximity, a pattern of increasing levels of discipline persisted. Further, while Bassett was disciplined for these infractions, Bassett's peers who committed similar infractions were not disciplined. Here, unlike in *Bassett*, no additional evidence other than proximity in time exists linking the employee's protected activity with the adverse employment action.

the re-engineering study of the legal department at Arch Coal that the majority of the legal work in the commercial contract area could be consolidated and performed by one less experienced attorney or a less experienced attorney and a paralegal. *See* Appendix at 141-43, 366, and 185. Evidence in the record also supports the fact that Buettner and Bussell, the two attorneys Quinn laid off as a result of the re-engineering study, were the highest paid among the three attorneys working in the commercial contract area. *See* Appendix at 213. Quinn decided to retain the less experienced, lower salaried, and allegedly more productive attorney, Anne O'Donnell. *See* Appendix at 251-52. Evidence on the record supports Arch Coal's articulated non-discriminatory reason for terminating Buettner sufficient to meet its *McDonnell Douglas* burden for summary judgment purposes.

Buettner fails to discredit Arch Coal's factual allegations that she was terminated as a result of the reduction-in-force in the legal department at Arch Coal. For a plaintiff to survive summary judgment, she must adduce enough admissible evidence to raise genuine doubt as to the legitimacy of a defendant's motive, even if that evidence does not directly contradict or disprove a defendant's articulated reasons for its actions. *See Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 n.8 (8th Cir. 1994). The Court believes, viewing the evidence in the light most favorable to Buettner, she has not presented evidence from which a reasonable jury could conclude Arch Coal's legitimate, non-discriminatory reason for discharging Buettner was pretextual.

First, Buettner asserts Arch Coal's statement that the decision to terminate Buettner and Bussell was based on the recommendation by Arthur Andersen consultant, Cindy Munger, was pretext to conceal Quinn's true intention of removing Buettner. To support her claim, Buettner points to a memo from Quinn to the CEO of AC stating Quinn "anticipate[s] that replacing two lawyers with two paralegals will result in cost savings of $130,000." Appendix at 535. This memo was drafted two weeks before Quinn received the consultant's initial recommendation.

-14-

Additionally, Buettner alleges Munger in one of her initial memos to Quinn recommended only one position be eliminated.[12]  Buettner further asserts Quinn instructed Munger that the final report should appear as an independent Andersen analysis.  It is clear from evidence in the record that the re-engineering process was collaborative between Quinn and Munger.  *See* Appendix at 140-42 and 185.  Thus, Buettner's allegation that Quinn may have anticipated laying off two attorneys before receiving an initial report from Munger does not raise a doubt as to the legitimacy of Quinn's claimed reliance on Munger's final recommendation.  Rather, for Buettner's argument to raise a doubt as to the legitimacy of Quinn's claim, Buettner might have presented evidence which could have demonstrated Munger disagreed with the idea of removing two attorneys.  There is no evidence to support such an inference.  Munger specifically stated in her deposition on January 20, 1999, that her recommendation to eliminate two attorneys was independent of Quinn.  *See* Appendix at 143.  Moreover, Munger testified she would have said something if she disagreed with Quinn.  *See id.*  Thus, the Court cannot find nor does Buettner point to any evidence which shows Munger's recommendation to eliminate two attorney positions was not independently made.

Second, Buettner argues Arch Coal's claim that the commodity-type work in which Buettner was engaged was work which could be done by a less experienced attorney or paralegal is pretextual.  Buettner states that Quinn admitted her work was the most complex commercial work done by the legal department.  Buettner also states that at the beginning of the re-engineering study Quinn believed there was plenty of work in Buettner's division to keep a full time attorney busy.  Further, Buettner cites evidence showing she was ranked above Russell and O'Donnell in position for advancement.  None of Buettner's evidence, however, discredits Arch

---

[12]  The memo from the consultant, Cindy Munger, to Quinn states, "Downsize by two lawyers-- . . . we are really only eliminating one position, not two if you plan to put a contract person in there."  Appendix at 579.

Coal's factual allegation that Buettner was dismissed for cost and efficiency purposes. Buettner's references to her abilities, the nature of the work she performed, and her position for promotion do not address whether her discharge could affect cost and efficiency at Arch Coal and therefore fail to rebut Arch Coal's assertion that Buettner was discharged for cost and efficiency purposes.

Buettner's only evidence that challenges Arch Coal's articulated legitimate non-discriminatory reason for retaining the least skilled, lowest paid of the three commercial attorneys also fails to raise doubts as to the legitimacy of Arch Coal's motives. Buettner claims the consultant's report dated three days before Buettner was laid off recommends retaining one senior commercial counsel. Buettner asserts she would be the natural choice as Buettner had initially been hired to take over the coal sales work Bussell could not handle, and O'Donnell had no experience in the area of coal sales contracts. Moreover, Buettner states the recommendation to establish a senior commercial counsel was eliminated two days later. This, Buettner argues, provides sufficient evidence from which a jury may infer Quinn was manipulating the consultant's recommendations to justify his retaliatory decision to lay off Buettner. Buettner also claims that although Quinn testified O'Donnell took over all Buettner's coal sales work after Buettner was laid off, O'Donnell testified she did very little coal sales work after the layoffs. Buettner points to additional evidence that billing records to outside counsel increased throughout 1996, implying there was more work than O'Donnell could handle. Buettner's allegations, however, fail to challenge the legitimacy of Arch Coal's non-discriminatory reason for laying off Buettner. The fact that the consultant ultimately recommended there not be a senior counsel position with a higher salary merely supports Arch Coal's claims that the decision not to have a senior counsel was based on cost and efficiency grounds. Arch Coal challenges Buettner's allegation that the coal sales work remained a significant area of work after her termination and that outside counsel needed to be brought in. Even assuming, *arguendo,* Buettner's allegations were true, whether the workload remained the same or increased after Arch Coal laid off the two attorneys

does not show evidence of pretext but rather only whether Arch Coal made a good or a poor business decision in firing the two attorneys.

Buettner additionally argues Quinn's own ambitions belie the legitimacy of Arch Coal's articulated reason for laying off Buettner. Buettner claims evidence in the record shows Quinn had ambitions to move up into a non-legal, high-level position with the company at the beginning of the re-engineering process. Buettner argues the fact that Quinn did not decide to lay off Buettner until sometime after she complained about Panzarino and his remark regarding women and minorities implies Quinn wanted to get rid of Buettner because he feared her complaints of gender discrimination would prevent him from moving up in the company. There is no evidence, however, short of pure speculation, which Buettner proffers to support her theory. Thus, in her attempt to avoid summary judgment, Buettner failed to discredit Arch Coal's articulation of a legitimate, non-discriminatory reason for terminating Buettner.

A plaintiff facing a summary judgment motion cannot "get to a jury without 'any significant probative evidence tending to support the complaint.'" *Anderson*, 477 U.S. at 249 (quoting *First Nat'l Bank of Az. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)). To avoid summary judgment, the non-movant must make a sufficient showing on every essential element of its claim on which it bears the burden of proof. *See Osborn v. E.F. Hutton & Co., Inc.*, 853 F.2d 616, 618 (8th Cir. 1988). After careful review of the district court's decision and the arguments of the parties de novo, this Court concludes that the district court properly granted summary judgment on Buettner's Title VII and Missouri Human Rights Act retaliation claims.

B.    Wage Discrimination

Buettner argues she established a prima facie case of wage discrimination under Title VII warranting trial.  The Eighth Circuit has held that Equal Pay Act, 29 U.S.C. § 206(d) (1994), standards apply to Title VII claims of "unequal pay for equal work." *McKee v. Bi-State Dev. Agency*, 801 F.2d 1014, 1018 (8th Cir. 1986).  Accordingly, to establish a prima facie case of wage discrimination based on unequal pay, a plaintiff must show that the defendant paid male workers more than she was paid for equal work in jobs that required equal skill, effort, and responsibility and were performed under similar conditions.  *See* Equal Pay Act, 29 U.S.C. § 206(d); *see also McLaughlin v. Esselte Pendaflex Corp*., 50 F.3d 507, 513 (8th Cir. 1995).

Whether two jobs entail equal skill, effort, or responsibility requires practical judgment on the basis of all the facts and circumstances of a particular case.  *See McLaughlin,* 50 F.3d at 513 (citing *Krenik v. County of Le Suer*, 47 F.3d 953, 960 (8th Cir. 1995)).  Skill includes such considerations as experience, training, education, and ability.  *See id.*  Effort refers to physical or mental exertion needed to perform the job.  *See id.*  Responsibility concerns the degree of accountability required in performing a job.  *See id.*  The plaintiff bears the burden of establishing that the positions involve equal work.  *See Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974).  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to prove the pay differential is based on a factor other than gender.  *See id.* at 196-97.

Buettner compares her level of compensation with that of Bob Jones.  Buettner states that both she and Jones graduated from law school in the same year, had similar duties and responsibilities during the period in which Buettner worked for ACS, and Buettner had worked longer in-house at a coal company than Jones. Buettner argues any additional responsibilities Jones had were acquired later, after Buettner left ACS's employ.  Buettner points to evidence that Quinn acknowledged

-18-

the pay differential between her and Jones and stated that he was going to try and "catch up" Buettner to Jones's salary. Buettner argues Quinn's contention that he qualified the statement by saying the catching up depended on Buettner receiving greater responsibility and the fact that Buettner does not recall such a statement raises a genuine issue of material fact warranting trial.

Although evidence shows Jones received more pay than Buettner, Buettner did not show she and Jones had similar responsibilities, seniority, or background. Although Jones and Buettner graduated from law school in 1987, Buettner acknowledges that Jones had two years more experience at ACS, had a greater depth of mining industry experience, and supervised another attorney while Buettner did not. *See* Appendix at 446. Additionally, although Buettner claims Jones did not have litigation responsibilities at the time she was hired to work at ACS, Quinn testified at his deposition on January 8, 1999, that Jones handled the primary responsibility for litigation at the time Buettner was hired. *See* Appendix at 170. Buettner does not provide sufficient evidence to the contrary.[13] As Buettner failed to establish that she and Jones had similar responsibilities, seniority, or background, whether Quinn qualified his statement concerning "catching" Buettner up to Jones's salary is irrelevant. Rather, on the basis of the facts presented by Buettner, she has failed to establish a prima facie case of discrimination based on equal pay. Accordingly, this Court finds the district court did not err in granting summary judgment in this matter.

---

[13] There is no genuine issue of fact here. Although Buettner, in her brief, denies Jones had litigation responsibility at the time she was hired by ACS, the evidence to which Buettner cites merely states that she did not believe he had those responsibilities at that time. *See* Appendix at 446. Thus, there is no question of fact on this issue.

-19-

## IV. CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.