**In re David P. WALSH, Debtor.**

**David P. Walsh, Plaintiff,**

**v.**

**United States of America, Internal Revenue Service, Defendant.**

**Bankruptcy No. 97–33916.**
**Adversary No. 99–3344.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

March 29, 2001.

---

**2.** The interest rate on Conseco's second mortgage note was 18.49% for 20 years.

Kenneth E. Keate, St Paul, MN, for the plaintiff.

Katja M. Eichinger, Trial Attorney, U.S. Department of Justice, Washington D.C., for the defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

GREGORY F. KISHEL, Chief Judge.

This adversary proceeding came on before the Court on November 29, 2000, for hearing on the Defendant's motion for summary judgment. The Defendant ("the United States") appeared by Katja M. Eichinger, Trial Attorney, Tax Division, U.S. Department of Justice. The Plaintiff ("the Debtor") appeared by his attorney, Kenneth E. Keate. Upon the record made for the hearing and certain post-hearing development, the Court makes the following order.

### IDENTITY OF PARTIES AND NATURE OF ADVERSARY PROCEEDING

The Debtor filed a voluntary petition for relief under Chapter 7 on June 6, 1997. He received a discharge in the due course of his case, via an order entered on September 9, 1997. The United States, through the Internal Revenue Service, was scheduled as a creditor in the case. There is no dispute that the United States received the appropriate clerk's notices for the case.

On December 21, 1999, the Debtor commenced this adversary proceeding. The

United States timely answered the Debtor's complaint.

Through this adversary proceeding, the Debtor seeks a determination that his liability to the United States for personal income taxes for years 1988 and 1989 were discharged in BKY 97–33916.[1] His theory is four-fold. It is structured in light of the Bankruptcy Code's several exceptions from discharge for tax claims, it addresses each of them for his liability for 1988–89, and its points are summarized as follows:

1. The liability was not excepted from discharge by 11 U.S.C. § 523(a)(1)(A), because the last due dates for his returns for 1988 and 1989 were outside the period that commenced three years before the date of his bankruptcy filing, and the Internal Revenue Service's assessment on the returns was before the 240–day period of 11 U.S.C. § 507(a)(8)(A)(ii).

2. The liability is not excepted from discharge under 11 U.S.C. § 523(a)(1)(B)(i), because on March 3, 1994, he did file returns on appropriate forms for tax years 1988 and 1989.

3. The liability is not excepted from discharge by 11 U.S.C. § 523(a)(1)(B)(ii), because the late filing of those returns did not take place within the period that started two years before the date of his bankruptcy filing.

4. The liability is not excepted from discharge by 11 U.S.C. § 523(a)(1)(C), because "[n]o allegation has been made that [the Debtor] either made a fraudulent return or willfully attempted in any manner to defeat tax due on his income for . . . 1988 and 1989."

In its answer, the United States variously admits and denies the individual fact allegations of the Debtor's complaint. It requests a judgment declaring that the Debtor's tax liabilities are nondischargeable. It also seeks a declaration that its pre-petition notice of tax lien continues in full force and effect.

The main theory of the defense emerged from the record on the present motion. It is that the documents that the Debtor filed with the IRS on March 3, 1994 no longer could have the status of required tax returns cognizable under 11 U.S.C. § 523(a)(1)(B). Hence, as the United States would have it, that statute lies to except the Debtor's liability for tax years 1988 and 1989 from discharge, because "a return . . . was not filed" for either year.

## MOTION AT BAR

The United States now moves for summary judgment on the issue of the dischargeability of the Debtor's tax liabilities for 1988–89. The governing rule is FED. R.BANKR.P. 7056.[2] To merit the summary adjudication of a dispute under this rule, the Court must make a threshold determination that there is "no genuine issue as to

---

1. In his complaint, the Plaintiff also seeks a more general determination that his personal income tax liability for all years up to and including 1993 was discharged in the same case. The present motion only pertains to the two identified years; thus, it is actually one for partial summary judgment.

2. This rule makes FED.R.CIV.P. 56 applicable to adversary proceedings in bankruptcy. In pertinent part, FED.R.CIV.P. 56(c) provides that, upon a motion for summary judgment,

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits [submitted in support of the motion], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

any ... fact" that is material to the claims or defenses at issue on the motion. *In re Circuit Alliance, Inc.*, 228 B.R. 225, 229–230 (Bankr.D.Minn.1998). After that, the movant must still show that the governing law lies in its favor, under the facts thus established. *Guinness Import Co. v. Mark VII Distributors, Inc.*, 153 F.3d 607, 610–611 (8th Cir.1998); *Osborn v. E.F. Hutton & Co.*, 853 F.2d 616, 618 (8th Cir. 1988). The Eighth Circuit has noted many times that summary judgment is a particularly appropriate means of judicial decision-making where the issues in litigation are "primarily legal rather than factual." *E.g., Gordon v. City of Kansas City*, 241 F.3d 997, 1002 (8th Cir.2001); *Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 713 (8th Cir.2000), *United States Fidelity and Guaranty Co. v. Housing Auth. of the City of Poplar Bluff*, 114 F.3d 693, 695 (8th Cir.1997); *Crain v. Board of Police Comm'rs*, 920 F.2d 1402, 1405–1406 (8th Cir.1990). *See also State of Minnesota, Dept. of Revenue v. United States*, 184 F.3d 725, 728 (8th Cir.1999) (where dispute is presented on stipulated or uncontested facts and presents only questions of law, disposition by summary judgment is appropriate).

While not moving for summary judgment as such, the Debtor used the closing section of his responsive memorandum to request a determination that his tax liability for 1988–89 was dischargeable and had been discharged. The lack of a formal motion would not bar the Court from granting such relief to him, were there no triable fact dispute and were the law to merit that result. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (federal trial courts may grant summary judgment to a party

*sua sponte*, where record merits it and no purpose would be served by delaying disposition); *Interco Inc. v. Nat'l Surety Corp.*, 900 F.2d 1264, 1268 (8th Cir.1990); *In re Mid–City Hotel Assoc.*, 114 B.R. 634, 646 (Bankr.D.Minn.1990) (foregoing authorities support grant of summary judgment to respondent that did not move for such relief in its own right, where facts are uncontested and law requires judgment in respondent's favor).

## UNDISPUTED FACTS

As it turns out, the parties have no dispute over a body of individual facts that are material to the one identified issue:

1. The Debtor is a wage earner, employed at all relevant times as a machine mechanic in factories that make and imprint envelopes. For the purposes of federal income taxation, the Debtor was a calendar-year taxpayer at all relevant times.

2. The Debtor did not file personal income tax returns for 1988 and 1989 [3] timely, that is, by April 15 of the following year or by the deadline fixed by law upon an automatic extension after April 15.

3. The Collection Branch of the Internal Revenue Service computed the Debtor's income tax liability for 1988 based on income attributable to him as reported by his employer(s), bank(s), and other sources. On February 21, 1991, the Collection Branch mailed the Debtor a notice that it had computed the tax and associated penalties and interest. The notice advised the Debtor that the IRS was prepared to assess that liability against him, and that he had 30 days to make one of several forms of response. It proffered him the opportunity to file his own tax

---

**3.** All further references to 1988 or 1989 will signify the Debtor's tax years—which coincide with these calendar years.

return, to explain why he was not required to do so, to send additional information for consideration, or to appeal the proposed assessment.

4. On March 25, 1991, the IRS prepared and forwarded to the Debtor a substitute return for 1988, pursuant to 26 U.S.C. § 6020(b).

5. On May 9, 1991, the Collection Branch sent the Debtor another notice regarding its computation of tax liability for 1988, stating a larger amount. The IRS's file copy of this letter bears the stamp "UNDELIVERED."

6. The Debtor did not respond to either notice of computation of tax.

7. On August 23, 1991, the IRS sent the Debtor a notice of deficiency on his tax liability for 1988. The notice included an advisory of the Debtor's right to file a petition in the U.S. Tax Court to contest the deficiency and to obtain a redetermination of the liability.

8. On February 7, 1992, the IRS sent the Debtor a similar notice of deficiency, stating a slightly reduced amount for the 1988 liability.

9. The Debtor did not respond to either notice of deficiency.

10. On November 25, 1991, the IRS prepared and forwarded to the Debtor a substitute return for 1989, again pursuant to 26 U.S.C. § 6020(b). The Debtor did not file this substitute return.

11. At the times that he received the various notifications from the IRS, the Debtor did not believe that he did not owe the taxes in question. He did not respond to the notifications because he was going through marital difficulties and other personal turmoil.

12. At some point in 1991, the IRS began seizing a substantial portion of the Debtor's wages under color of its perfected tax lien and/or tax levy. These seizures continued for approximately three years.

13. On March 3, 1994, the Debtor appeared at the offices of the IRS at the Federal Courthouse in St. Paul. He had decided "to get on the straight and narrow" with his tax liabilities. With the assistance of IRS personnel, the Debtor completed and submitted Forms 1040 for 1988 and 1989, among other years.

14. As between the IRS's assessed amount of the base income tax for 1988 and that shown on the Debtor's Form 1040, there is a difference of $1.00. That difference is due to the Debtor having rounded his $19.93 in total withholding for the year up to $20.00, and the IRS having rounded it down.

15. There is a difference of $71.00 between the comparable figures for 1989, with the IRS's assessed tax being higher. There is no way to determine the origin of the discrepancy, as the record does not contain copies of the original notices, if any, that the IRS sent to the Debtor for 1989.

16. After the Debtor submitted the Forms 1040 for 1988 and 1989, the IRS made no changes in his tax liabilities and no additional assessment for those years.

## DISCUSSION

■ This motion presents a single issue, on the merits of the one defense that the United States maintains: whether the Debtor's tax obligations for 1988–89 are within the scope of § 523(a)(1)(B)(i), that is, a "debt ... with respect to which a return, if required, was not filed."[4] The

---

4. Both sides have assumed that this point is dispositive as to the Debtor's tax obligations for the two years. The Debtor maintains that none of the other exceptions under

parties have argued as if there were no genuine issue of material fact, and they are correct in assuming so. This issue is ripe for determination as a matter of law.

The Debtor argues that for each of the two years in question, he filed a return— that is, "a formal statement on a required legal form showing taxable income, allowable deductions and exemptions and the computation of the tax due." *In re Hatton*, 220 F.3d 1057, 1060 (9th Cir.2000) (quoting WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY at 1008 (1985)). In his view, his submission of completed Form 1040s on March 3, 1994 satisfies the statute's requirement for filing of returns. This simple "fact," he maintains, is enough to take his situation out from under § 523(a)(1)(B)(i), regardless of when he submitted the Forms 1040, and regardless of how that submission fell into the sequence of the IRS's actions to assess and collect its claims.

The Debtor relies on the "plain meaning" analysis applied by the Supreme Court in much of its bankruptcy jurisprudence for more than a decade.[5] His argument is that, with the statute as bare of qualifying language as it is, his mere submission of completed forms for individual income tax returns to the IRS, in good order on their face, was enough to deprive the United States of this exception to discharge. A number of lower federal courts have agreed with this reasoning. *In re Nunez*, 232 B.R. 778 (9th Cir. BAP 1999); *In re Savage*, 218 B.R. 126 (10th Cir. BAP 1998); *In re Ralph*, 258 B.R. 504 (Bankr. M.D.Fla.2000); *In re Crawley*, 244 B.R. 121 (Bankr.N.D.Ill.2000); *In re Hindenlang*, 205 B.R. 874 (Bankr.S.D.Ohio 1997), *aff'd*, 214 B.R. 847 (S.D.Ohio 1997), *rev'd*, 164 F.3d 1029 (6th Cir.1999); *In re Sullivan*, 200 B.R. 327 (Bankr.N.D.Ohio 1996).

The United States does not deny that the basic physical act, the passage of pieces of paper, took place at St. Paul on the date stated. It does dispute that the papers were "returns" cognizable under § 523(a)(1)(B)(i). As the United States would have it, the issue is the substantive import of the documents that the Debtor submitted. It insists that legal significance is not to be accorded to the forms as perfunctorily as the Debtor would. It relies on decisions from the other line of authority on this issue: *In re Hindenlang*, 164 F.3d 1029 (6th Cir.1998); *Gentry v. United States*, 223 B.R. 127 (M.D.Tenn. 1998), *aff'g In re Gentry*, 214 B.R. 849

§ 523(a)(1) apply, and the United States does not say a thing to dispute that.

**5.** *E.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1 (2000); *Rake v. Wade*, 508 U.S. 464, 472–73, 113 S.Ct. 2187, 2192–193, 124 L.Ed.2d 424 (1993), *Pioneer Inv. Servs., Co. v. Brunswick Assoc. Ltd. Partnership*, 507 U.S. 380, 387, 113 S.Ct. 1489, 1494, 123 L.Ed.2d 74 (1993); *Patterson v. Shumate*, 504 U.S. 753, 758, 112 S.Ct. 2242, 2246–247, 119 L.Ed.2d 519 (1992); *Taylor v. Freeland & Kronz*, 503 U.S. 638, 642, 112 S.Ct. 1644, 1647–648, 118 L.Ed.2d 280 (1992); *Barnhill v. Johnson*, 503 U.S. 393, 395–400, 112 S.Ct. 1386, 1388–391, 118 L.Ed.2d 39 (1992); *U.S. v. Nordic Village, Inc.*, 503 U.S. 30, 32–37, 112 S.Ct. 1011, 1014–016, 117 L.Ed.2d 181 (1992); *Union Bank v. Wolas*, 502 U.S. 151, 160–62, 112 S.Ct. 527, 533, 116 L.Ed.2d 514 (1991); *Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.*, 502 U.S. 32, 38, 112 S.Ct. 459, 463, 116 L.Ed.2d 358 (1991); *Toibb v. Radloff*, 501 U.S. 157, 160–61, 111 S.Ct. 2197, 2199–200, 115 L.Ed.2d 145 (1991); *Hoffman v. Connecticut Dept. of Income Maintenance*, 492 U.S. 96, 101–02, 109 S.Ct. 2818, 2822–823, 106 L.Ed.2d 76 (1989) (plurality opinion); *United States v. Ron Pair Ents., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989). *Contra, BFP v. Resolution Trust Corp.*, 512 U.S. 1247, 114 S.Ct. 2771, 129 L.Ed.2d 884 (1994); *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

(Bankr.M.D.Tenn.1997); *In re Mickens,* 214 B.R. 976 (N.D.Ohio 1997), *aff'd,* 173 F.3d 855 (6th Cir.1999) (table); *In re Arenson,* 134 B.R. 934 (Bankr.D.Neb.1991). *See also In re Shrenker,* 258 B.R. 82 (Bankr.E.D.N.Y.2001).

So the initial question is identified: does one rely on the "plain meaning" of § 523(a)(1)(B)(i), whatever that is, or not?

■ Any application of the "plain meaning" approach to statutory construction must start by recognizing its qualification: the meaning of a statute is not necessarily the one suggested by the isolated words in its text, if this surface-oriented approach would lead to an absurd result, or an unreasonable one plainly at variance with the purpose of the legislation as a whole. *United States v. Ron Pair Ents.,* 489 U.S. at 242, 109 S.Ct. at 1030; *Bob Jones University v. United States,* 461 U.S. 574, 586, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157 (1983); *Resolution Trust Corp. v. Westgate Partners, Ltd.,* 937 F.2d 526, 529 (10th Cir.1991); *Grand, ex rel. U.S. v. Northrop Corp.,* 811 F.Supp. 333 (S.D.Ohio 1992). For the baseline against which the result is measured for absurdity or lack of it, one should glean the legislative purpose and regulatory goals of the statute from appropriate sources. These can include published legislative history, the text as a whole, and their cumulative tenor. *U.S. v. American Trucking Ass'ns,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940); *Church of Scientology of Calif. v. United States Dept. of Justice,* 612 F.2d 417, 421–22 (9th Cir. 1980); *Michaud v. Unites States,* 206 B.R. 1, 4–5 (D.N.H.1997).

We have such a backdrop here. Congress recognized that the treatment of taxing authorities' claims in bankruptcy implicates the conflicting interests of three constituencies: 1. taxing authorities charged with replenishing the public purse, which must be given a reasonable time and opportunity to carry out that function; 2. general creditors, which might find their net distributions from bankruptcy estates greatly reduced by "an excessive accumulation of taxes for past years"; and 3. debtors, with an interest in a post-bankruptcy "fresh start" free of the claims of both taxing authorities and general creditors. S.REP. No. 989, 95th Cong., 2d Sess. 14 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5800; *In re Waugh,* 109 F.3d 489, 492 (8th Cir.1997). In its provisions for the discharge of tax claims, Congress tried to balance these .interests. It expected the courts to apply these provisions so as to promote the integrity of taxing systems. *Id.* The process of voluntary assessment is a significant function within American taxing systems that reinforces their integrity. *Id.* Thus, while many of the nondischargeability provisions of § 523(a)(1) are keyed into the priority of distribution from the estate under 11 U.S.C. § 507, others apply to "tax claims . . . to whose staleness the debtor contributed by some wrongdoing or serious fault" in the process of voluntary assessment. *Id.*

■ Usually, revenue agencies do not immediately notice a taxpayer's failure to file returns. A persisting failure to file them requires the authorities to calculate and assess taxes through a time-consuming non-consensual process. Such failure often leads to the accrual of tax claims that are "stale" in the sense identified by Congress, because of delays in discovery and the process of notice to the taxpayer, calculation, and assessment. The import of the legislative history is clear: the voluntary filing of personal income tax returns is an essential step in the assessment process that must be encouraged. Section 523(a)(1)(B)(i) must be construed to promote it. Applying the penalty of nondis-

chargeability to debtors who have failed to follow filing requirements provides a strong deterrent to others.

The caselaw cited by the United States follows that general thought, with varying degrees of precision. Its premise is that § 523(a)(1)(B)(i) lies to uniformly penalize debtors whose dereliction in filing their returns forced the government into the formal assessment process. *In re Mickens*, 214 B.R. 976 (N.D.Ohio 1997); *In re Blutter*, 177 B.R. 209 (Bankr.S.D.N.Y. 1995); *In re Pruitt*, 107 B.R. 764 (Bankr. D.Wyo.1989); *In re Haywood*, 62 B.R. 482, 485 (Bankr.N.D.Ill.1986). These decisions avoid a reductionist reading of the "plain meaning" of § 523(a)(1)(B)(i), and have a strong basis in the legislative history for doing so. They do not always articulate their analysis as such, but they clearly envision an "absurd result": a debtor that flouts its duty to file tax returns, forces the authority through costly assessment procedures, allows the assessed liabilities to become fixed and final, and then does an end-run around consequences by lobbing in a belated voluntary return and filing for bankruptcy. As these courts observe, using discharge in bankruptcy as an essential part of that strategy undercuts the role of voluntary assessment in the administration of taxation. Giving sanction to this would be too much of an incentive to those whose only risk is loss through involuntary collection procedures during the time their tax debts were becoming stale enough to be otherwise subject to discharge under § 523(a)(1). *E.g., In re Hindenlang*, 164 F.3d at 1035 ("under [the debtor's] theory,

a person filing a Form 1040 after assessment would be better off in bankruptcy than someone who did not.... Such a result would create an unjustifiable inconsistency in the law."); *In re Mickens*, 214 B.R. at 978; *In re Blutter*, 177 B.R. at 211.

However, while correct in result, this line of decisions is flawed in its rationale. The analysis that drives them is based on a transplanted definition that is just too facile in its transposition. The definition is for "return," and was first judicially crafted in *Beard v. Commissioner*, 82 T.C. 766, 1984 WL 15573 (1984), *aff'd*, 793 F.2d 139 (6th Cir.1986).[6]

*Beard's* framing of the essence of a tax return was based on two U.S. Supreme Court decisions. As such, it was well-put in a general sense—but only in context. The taxpayer in *Beard* had extensively altered the titles of the line-entries on an official Form 1040 in a way that was apparently designed to make out the basis for an undeserved tax refund, while avoiding the accusation that the return was fraudulent on its face. 82 T.C. at 769–770. To support its claim for monetary penalties for failure to file a return, the IRS sought a ruling that the tampered form was not a "return" as such. On the basis of pronouncements in several Supreme Court decisions,[7] the *Beard* court found that the taxpayer's tampered submission did not conform with the content requirements of IRS regulations and was not "an honest and reasonable attempt to satisfy the requirements of the Federal income tax law"; hence, it was "not a return" for

---

6. Neither the Bankruptcy Code nor the Internal Revenue Code define the term "return," as liberally as they use it in their text; hence the judiciary's assumption of the semantic spear.

7. *Florsheim Bros. Drygoods Co. v. United States*, 280 U.S. 453, 50 S.Ct. 215, 74 L.Ed. 542 (1930); *Zellerbach Paper Co. v. Helvering*,

293 U.S. 172, 55 S.Ct. 127, 79 L.Ed. 264 (1934); *Badaracco v. Commissioner*, 464 U.S. 386, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984); *Commissioner v. Lane–Wells Co.*, 321 U.S. 219, 64 S.Ct. 511, 88 L.Ed. 684 (1944); and *Germantown Trust Co. v. Commissioner*, 309 U.S. 304, 60 S.Ct. 566, 84 L.Ed. 770 (1940).

the purposes of the filing requirements. 82 T.C. at 779.

In recent years, the courts on both lines of cases have used this test to determine whether a debtor had met tax return filing requirements for the purposes of bankruptcy law. There is a justification for applying *Beard*, including its intent element, to documents that did not match the official form prescribed for the particular purpose. The *Beard* court, in fact, expressly cited the lack of facial conformity as one of the two reasons for its holding.[8]

However, the overlay of an intent element just does not sit well with facts like the ones at bar. At the risk of seeming bound by externalities, one must acknowledge that a correct form, unaltered, and completed per instructions, really has the *essence* of a return. It fits the common understanding, as set forth in the dictionary definition just quoted. It meets three out of the four *Beard*[9] criteria on its very face. If it "purport[s] to be a return," and looks like one, how can it not be one—or how can it not be given the signifi-

cance of one, at least as it stands, outside the administrative process?

To some extent, perhaps, this is a matter of roses and roses.[10] Getting too far into it would stray from the hard-and-fast of legal analysis. One can avoid pseudo-platonic philosophizing, justify the results in the *Hindenlang* decisions, and even incorporate a large piece of their reasoning. The standard would focus on a different one of the very few words within § 523(a)(1)(B)(i): the modifier "required," rather than the noun "return."

In point of fact, once the IRS has gone through the process of computing a derelict taxpayer's income tax from alternative information sources, preparing substitute returns, issuing notices of deficiency, and assessing taxes that then become an enforceable liability, the filing of voluntary returns by a taxpayer simply is no longer "required." The taxpayer's duty and the government's rights have been fixed and finalized by a non-voluntary process. If the taxpayer disputes the assessed liability, its only remedy is to pay the assessed amount and to commence suit for a refund

---

8. Too, longstanding caselaw recognizes two broad tax-law precepts that can operate at cross-purposes:

> Perfect accuracy or completeness is not necessary to rescue a return from nullity, if it purports to be a return, is sworn to as such ... and evinces an honest and genuine endeavor to satisfy the law. This is so even though at the time of filing the omissions or inaccuracies are such as to make amendment necessary.

*Zellerbach Paper Co. v. Helvering*, 293 U.S. at 180, 55 S.Ct. 127 and

> Congress has given discretion to the Commissioner to prescribe by regulation forms of returns *and has made it the duty of the taxpayer to comply*.... The purpose is not alone to get tax information in some form but also to get it with such uniformity, completeness, and arrangement that the physical task of handling and verifying returns may be readily accomplished.

*Commissioner v. Lane–Wells Co.*, 321 U.S. at 223, 64 S.Ct. 511 (emphasis added). In light of these pronouncements, injecting the taxpayer's intent into the elements of a tax return serves a purpose in the case of a submission in an odd form, not readily subject to uniform review by the administrators. It enables courts to distinguish the deliberate malefactor who is seeking to derail the taxing authority, from the off-base, misguided unfortunate who is not.

9. It presents itself as a return, on its face, hence "purporting" to be one; it contains the official proviso for execution under penalty of perjury; and it contains sufficient data to enable the calculation of tax that governing law and regulation would require. *Hindenlang*, 164 F.3d at 1032 (identifying four elements gleaned from *Beard*).

10. W. Shakespeare, *Romeo and Juliet*, Act II, scene ii, ll. 43–44.

in the federal courts. *In re Hindenlang*, 164 F.3d at 1031 n. 1 (citing 26 U.S.C. §§ 6212(a), 6213(a), and 7422(a), and 28 U.S.C. § 1346(a)). As the cases say in truncated jargon, at that point voluntary returns "no longer serve[ ] any tax purpose." *In re Hindenlang*, 164 F.3d at 1033. *See also In re Mickens*, 214 B.R. at 977–78 (detailing various aspects of tax collection that post-assessment filing of voluntary return can *not* affect.)

Once an involuntary government-made assessment is final, then, the taxpayer no longer can use the perfunctory expedient of filing belated voluntary returns to subject a now-stale tax claim to discharge in bankruptcy. As here, such an action only duplicates a process completed under law, to no identifiable purpose in the government's revenue function. As a taxpayer, such a debtor may still have the option of paying and then proving in a suit for refund that he was in fact not liable for the taxes. This would be a matter of the merits, under tax law. By inaction that forces the taxing authority through involuntary assessment, however, such a debtor forfeits the right to discharge the liability in bankruptcy.

This approach gets there through a variant construction of the participle "required." The word could be equated to the concept of the general duty under law to perform the act of filing a return. The extant cases assume this equation, without comment or question. Using that definition, however, opens the door to the absurd result just identified. This result is avoided by linking the meaning of "required" to the return's utility to the underlying process—fixing and liquidating a debt for taxes. Viewing it in this way makes every bit of sense logically: once the tax obligation has been fixed and liquidated via assessment, the process is done and the return is no longer "required" to further it.

On balance, this analysis better supports a departure from a pat application of the "plain meaning" approach, than does the one based on *Beard*. It gives more appropriate deference to the underlying policy goal, of promoting responsible taxpayer participation in the system. When it is applied to the established facts here, the result is clear. The Debtor lost the right to subject his tax obligations for 1988–89 to discharge in bankruptcy when he allowed the IRS to complete its assessment process, notwithstanding the fact that the claims of the United States otherwise became stale and dischargeable under the other relevant provisions of § 523(a)(1). The United States, then, is entitled to the grant of partial summary judgment that it seeks.[11]

---

**11.** It would not be appropriate to actually enter judgment at this point in the litigation, however. Because "more than one claim for relief is presented" in this adversary proceeding, FED.R.CIV.P. 54(b), *as incorporated by* FED. R.BANKR.P. 7054(a), is implicated. Under this rule

... the court may direct the entry of a final judgment as to one or more but fewer than all of the claims ... only upon an expressed determination that there is no just reason for delay and upon an express direction for the entry of judgment.

To avoid piecemeal appeals over claims that founded on common nexi of fact or similar legal issues, *Interstate Power Co. v. Kansas City Power & Light Co.*, 992 F.2d 804, 807 (8th Cir.1993), the Eighth Circuit has cautioned that trial courts should not make the certification contemplated by this rule where there is a "significant relationship" between the requests for relief decided on a pre-trial motion and those remaining. *In re Flight Transp. Corp. Sec.*, 825 F.2d 1249, 1251 (8th Cir.1987), *cert. denied*, 485 U.S. 936, 108 S.Ct. 1113, 99 L.Ed.2d 273 (1988); *Hayden v. McDonald*, 719 F.2d 266, 270 (8th Cir.1983). Given the more inclusive request for relief that is not addressed in this motion, it is appropriate to defer entry of a final judgment

### ORDER FOR JUDGMENT

Based upon the Findings of Fact and the Conclusions of Law contained in the discussion just recited,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. The Plaintiff's obligations to the Defendant for personal income taxes for tax years 1988 and 1989 were excepted from the discharge the Plaintiff received in BKY 97–33916, by operation of 11 U.S.C. § 523(a)(1)(B)(i).

2. The Notices of Federal Tax Lien that the Defendant perfected before the Plaintiff's bankruptcy filing continue in effect and attach to all existing property and rights to property, including exempt property, that the Plaintiff owned on and prior to the date of his bankruptcy filing.

3. The Plaintiff's request for summary judgment is denied.

4. Entry of judgment on Terms 1 and 2 of this order shall be deferred pending final adjudication on the Plaintiff's remaining request for relief.

until the remaining issues are presented for adjudication. *See, in general, In re Northgate Computer Syst., Inc.,* 240 B.R. 328, 368–69 (Bankr.D.Minn.1999).