# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3345

_____

Terri Wallace,                                    *
                                                  *
            Plaintiff - Appellant,                *
                                                  *
      v.                                          *
                                                  * Appeal from the United States
DTG OPERATIONS, INC., a Foreign                   * District Court for the Western
Corporation, also known as Dollar                 * District of Missouri.
Rent-A-Car Systems, Inc.; DOLLAR                  *
RENT-A-CAR, INC., a Foreign                       *
Corporation,                                      *
                                                  *
            Defendants - Appellees.               *

_____

Submitted: April 14, 2005
     Filed: March 29, 2006

_____

Before MELLOY, COLLOTON, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.

      Plaintiff-Appellant Terri Wallace appeals the district court's adverse grant of summary judgment on her retaliatory discharge claim. Because we find outstanding questions of material fact regarding the issue of retaliatory intent, we reverse.

## I. Factual Background

We present the facts in a light most favorable to Ms. Wallace, the non-moving party, and draw all reasonable inferences in her favor. Buettner v. Arch Coal Sales Co., 216 F.3d 707, 713 (8th Cir. 2000).

On May 9, 2001, Ms. Wallace began working for DTG Operations, Inc. (the "Company"), as a station manager in its Kansas City International Airport, Dollar Rent-A-Car station. Ms. Wallace's immediate supervisor was the Company's city manager for Kansas City, Brad Kjar. Mr. Kjar's immediate supervisor was the regional manager for the midwest region, Tom Mierendorf. Mr. Mierendorf's immediate supervisor was Stephen Duffy, the Company's vice-president of operations. Ms. Wallace was the least-senior station manager at the location. Mark Lovelace, another station manager at the Kansas City International Airport location, had one day of seniority over Ms. Wallace.

On April 9, 2002, Ms. Wallace complained via email to Mr. Mierendorf about sexually inappropriate comments and contact from Mr. Kjar. Her complaints related to four alleged incidents as follows. On February 27, 2002, Mr. Kjar called Ms. Wallace and others into his office where he used the speaker phone to dial a number that played a recorded message about masturbation. Later, Mr. Kjar called Ms. Wallace and others into his office to view pornographic computer images of the cartoon character Popeye. On November 21, 2001, and again on March 4, 2002, he commented to Wallace on the size of her "butt," once while lifting her arm to create an unobstructed view of the object of his comment. Regarding the Popeye cartoon, he warned the employees that some people might find the material offensive, and Ms. Wallace walked out of his office. She did not complain directly to Mr. Kjar about any of these incidents.

The Company's sexual harassment policy stated that an employee could complain to the supervisor of an alleged harasser if the employee was not comfortable complaining directly to his or her own supervisor or directly to the harasser. In fact, before April 9, Ms. Wallace had become upset with Mr. Kjar's behavior, checked with a human resources employee named George Corneau, and received instructions to bypass Mr. Kjar and complain directly to Mr. Mierendorf. Also, Mr. Duffy stated in his deposition that Ms. Wallace reported the incidents to an appropriate supervisor.

Notwithstanding the propriety of Ms. Wallace's reporting procedure, Mr. Mierendorf testified in his deposition that he "was not happy that she did not feel comfortable or take the time to actually just communicate with [Mr. Kjar]." Mr. Mierendorf conceded that Ms. Wallace followed a correct procedure by going over Mr. Kjar's head, but stated that "what [he] was not pleased about [was] that she did not feel comfortable just to go to him and talk to him." Mr. Mierendorf also testified that he liked to joke around with employees to "liven up the workplace," he thought joking "should happen openly and freely," and he thought Ms. Wallace's complaint would put a "muzzle on interaction that should happen freely and openly and that was no longer going to occur."

Twenty-eight days after Ms. Wallace reported these acts to Mr. Mierendorf, he and Mr. Kjar met with Ms. Wallace in Mr. Kjar's office and terminated her employment with the Company. Mr. Mierendorf testified in his deposition that he actually made the termination decision at an earlier date, only fifteen days after her report. Before Mr. Mierendorf arrived in Kansas City for the meeting where he fired Ms. Wallace, he told Ms. Wallace that he was coming to Kansas City to discipline Mr. Kjar. Mr. Mierendorf testified that, in general, he made termination decisions jointly with city managers. He claimed, however, that in this instance, Mr. Kjar was not involved in making the decision to terminate Ms. Wallace.

At the meeting, Mr. Mierendorf told Ms. Wallace that there were too many station managers at the Kansas City International Airport location, a downturn in business following September 11, 2001 had reduced revenue at the location, and she was the least-senior manager at the location. Mr. Mierendorf told her that there was a policy at the Company that stated seniority should determine who to lay off. Ms. Wallace conceded in her deposition that the statements of fact surrounding a downturn in business and overstaffing at the management level were true. Ms. Wallace's attorney also conceded at oral argument before our court that these statements were true. Ms. Wallace, however, did not concede that these true statements accurately described the true motivation behind Mr. Mierendorf's decision to fire her.

Also at the meeting, Ms. Wallace asked to be transferred laterally to one of several open station manager positions in other cities. Mr. Mierendorf and Mr. Kjar refused to consider her for a transfer. They claimed that there was a November 2001 "written warning" in her personnel file in Kansas City that, under Company policy, prohibited their consideration of her as a possible candidate for transfer for a period of one year. Notwithstanding their claims regarding the Company's policy, Mr. Mierendorf had encouraged Ms. Wallace to apply for a transfer to Kentucky after the purported "written warning" appeared in her Kansas City file.

The Company, in fact, had a policy consistent with the supervisors' claim. The Company, however, did not consistently follow this policy. Rather, the policy was discretionary, as shown by the fact that employees with written warnings received transfers or were encouraged to apply for transfers within their respective one-year windows. Under Mr. Mierendorf's authority, Mr. Kjar himself received a transfer less than a year after he received a "written warning." Also, Mr. Mierendorf and Mr. Kjar had repeatedly told Mr. Lovelace to apply for positions at other locations. This occurred less than a year after Mr. Kjar gave Mr. Lovelace a "written warning." Further demonstrating the discretionary nature of this policy, Mr. Corneau and Mr. Duffy made clear in their depositions that there was not a regular practice at the

Company of checking employees' personnel files for "written warnings" before granting transfers or promotions.

The parties dispute not only the nature of the Company's policy on transfers, but also the propriety of applying that policy against Ms. Wallace. Ms. Wallace's personnel file at the local office in Kansas City contained a written record of a "verbal warning." This written record of a verbal warning was documentation of a verbal notice that Ms. Wallace had received in November 2001 for failing to meet a sales quota. Ms. Wallace's signature appeared on the document. Her official personnel file with the human resources office at headquarters in Tulsa, Oklahoma, however, did not receive this written record of a verbal notice until October 2002, five months after her termination. Mr. Kjar and Mr. Mierendorf stated that this document was a "written warning" sufficient under Company policy to disqualify Ms. Wallace from eligibility for transfer for one year. Ms. Wallace contests this characterization of the document. She relies on the deposition testimony of Mr. Duffy to demonstrate that the Company recognizes a distinction between written warnings and written records of verbal warnings. Mr. Duffy testified that verbal warnings and/or written records of verbal warnings are insufficient to trigger the company's one-year, no-transfer policy.

Suffice it to say, questions of fact abound regarding the Company's policy and the effect of the information in Ms. Wallace's personnel file. As discussed below, these questions of fact are material to the extent that they reveal what Ms. Wallace's supervisors actually believed about the nature of the Company's policy and what they actually believed about the applicability of that policy to Ms. Wallace.

During the depositions of Mr. Mierendorf, Mr. Corneau, and Mr. Duffy, counsel for Ms. Wallace explored the issue of whether anyone at the Company had considered terminating Ms. Wallace prior to her report of harassment. Mr. Mierendorf stated that he had not been involved in any discussions specifically regarding the termination of Ms. Wallace prior to her report of harassment. Neither Mr. Mierendorf

nor Mr. Duffy could recall exactly when they first discussed the issue of terminating Ms. Wallace. When asked about notes, records of communication, or other evidence that might help pin down the timing of such discussions—or of related discussions on the more general topic of manager lay-offs—Mr. Duffy stated that he had no such records because his personal computer had crashed over the course of "the past couple of years." Also, Mr. Mierendorf explained that he too had experienced a crash of his personal computer, that his crash was a total loss of all data, and that the data was not backed-up because it was a laptop computer. Mr. Mierendorf claimed that the lost data included "all of my files that we worked on for what our requirements were from each city for reducing head counts and instructions and requirements that came to us." There is no evidence to suggest that these two computer crashes were related.

Mr. Corneau did have documentation that related to Ms. Wallace from around the time of her termination. This documentation was a single entry in a log of telephone calls. It was dated April 29, 2002, and read, "Tom, about Terri Wallace write-up from Brad. Have not received any write-up." This entry was made after Ms. Wallace's report of harassment.

Although no one from the Company actually claimed to have specifically discussed or considered the termination of Ms. Wallace prior to her report of harassment, Mr. Mierendorf did claim that before Ms. Wallace made her report of harassment, he knew he had too many station managers at the Kansas City International Airport location. Mr. Kjar also stated that he knew before Ms. Wallace's report of harassment that he could not keep all of his station managers. Mr. Mierendorf and Mr. Kjar both stated that there were too many managers at the location because one of the station managers, Mr. Lovelace, had completed an in-house management training program and was expected to apply for city manager positions at other locations but had not applied for any such positions.

Mr. Lovelace left the Company in February or March of 2003. After he left, the Company advertised the open position of station manager at the Kansas City International Airport location on more than one occasion. This was the same position Ms. Wallace had held. Ms. Wallace repeatedly applied for the open position but received no response. She alleges that this is further evidence to refute the Company's claim that she was terminated out of economic necessity rather than as an act of retaliation.

To further refute the Company's explanation for her termination, Ms. Wallace emphasizes the isolated nature of her termination relative to the broad downturn in business. All employees of the Company who were deposed testified that the terrorist attacks had a broad and severe impact on the travel industry. In his deposition, however, Mr. Mierendorf stated that no other managers in the Midwest Region were laid-off as a result of the downturn in business that followed September 11, 2001. Following September 11, some manager positions across the country remained vacant after managers left the Company or transferred to other locations. Also, some non-management employees were laid off in the two months that followed September 11. The Company later hired back some of these non-management employees. No management employees other than Ms. Wallace were laid-off during all of 2002, and no Midwest Region employees at all, other than Ms. Wallace, were laid-off during 2002.

Finally, Ms. Wallace makes reference to two other incidents in the history of her employment with the Company that she believes to be material to her case. Prior to her termination, Ms. Wallace asked Ms. Kjar about a possible transfer or promotion to the position of revenue manager at another location. Mr. Kjar did not respond, and as a deadline approached, Ms. Wallace contacted the human resources department directly. When Mr. Kjar found out that she had done so, he became upset and stated, "how dare she" to another employee. Also, following her termination, Ms. Wallace contacted a city manager at another location, Clayton Hopkins, to seek help in

obtaining a possible transfer. The practice of contacting personnel at locations with openings was commonplace within the Company. Nevertheless, when Mr. Kjar or others working under him discovered emails from Ms. Wallace to Mr. Hopkins, Mr. Kjar reported this fact to his superiors, and Mr. Hopkins was disciplined for having tried to assist Ms. Wallace.

Ms. Wallace instituted proceedings against the Company by timely filing a pro-se charge of discrimination with the EEOC. On the one-page form that comprised her charge, she alleged discrimination and retaliation. She did not check the box labeled "Continuing Action." Also, she stated that the earliest and latest date of discrimination took place on May 6, 2002, the date of her termination.

Ms. Wallace then brought suit alleging a claim of sexual harassment based on Mr. Kjar's actions. She also included a claim of retaliatory discharge. On summary judgment, the district court found that her claim of sexual harassment failed as a matter of law under the severe and pervasive prong of our framework for the analysis of hostile work environment sexual harassment claims. The district court also found that Ms. Wallace's retaliatory discharge claim failed because the Company stated a legitimate reason for her termination and she failed to present evidence sufficient to raise a material question of fact as to whether the Company's explanation was merely pretextual. In this appeal, Ms. Wallace abandons her harassment claim and argues only that she is entitled to a trial on her retaliation claim. She alleges that the Company's stated reason for her termination is merely a pretext to hide the true motivation for her termination, namely, intentional retaliation for complaining about Mr. Kjar's actions.

We also note that, although not advanced by the Company as an argument below, the record demonstrates that the Company terminated Ms. Wallace's employment one day before certain benefits would have vested. On appeal, the Company argues that this fact lends further support to its claim that Ms. Wallace's

termination was not the result of intentional retaliation. Also, although not stated to Ms. Wallace as a reason for her termination at the time of her termination, the Company claims that she performed poorly while temporarily assigned to work in a Chicago office. There was no disciplinary action taken, nor written record created, concerning her alleged poor performance while temporarily stationed in Chicago. Notwithstanding these arguments concerning Ms. Wallace's work performance, Mr. Mierendorf insisted in his deposition that the decision to terminate Ms. Wallace was based strictly on seniority.

## II. Standard of Review

We review a grant of summary judgment de novo. Buettner v. Arch Coal Sales, Co., 216 F.3d 707, 713 (2000). We have stated that summary judgment should be used sparingly in the context of employment discrimination and/or retaliation cases where direct evidence of intent is often difficult or impossible to obtain. Haas v. Kelly Services, Inc., 409 F.3d 1030, 1034-35 (8th Cir. 2005); see also, United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."). We have also stated, however, that no separate summary judgment standard exists for discrimination or retaliation cases and that such cases are not immune from summary judgment. See Berg v. Norand Corp., 169 F.3d 1140, 1144 (8th Cir.1999) ("there is no 'discrimination case exception' to the application of Fed.R.Civ.P. 56, and it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial"); see also, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'") (quoting Fed. R. Civ. P. 1).

Taken together, the above cases demonstrate that, although Rule 56 contains only one standard, we must exercise *particular* caution when examining the factual question of intent to ensure that we dutifully extend all justifiable inferences in favor of the non-moving party. See Gill v. Reorganized Sch. Dist. R-6, 32 F.3d 376, 378 (8th Cir. 1994) (stating that we review summary judgment "with caution in employment discrimination cases . . . because intent is inevitably the central issue"). Where reasonable fact finders could extend an inference in favor of the non-moving party without resorting to speculation, we may not declare the inference unjustifiable simply because we might draw a different inference. See Wabun-Inini v. Sessions, 900 F.2d 1234, 1238 (8th Cir. 1990) ("We recognize that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries."). Viewing the evidence as a whole, and in this deferential light, we must deny summary judgment where a reasonable jury could find in favor of the non-moving party.

III. Discussion

Title VII of the Civil Rights Act of 1964 prohibits employers from taking adverse actions against employees in retaliation for employee reports of harassment or discrimination. 42 U.S.C. § 2000e-3(a). "A claim for retaliation is not based upon [prohibited] discrimination, but instead upon an employer's actions taken to punish an employee who makes a claim of discrimination." Haas, 409 F.3d at 1036. In general, as long as a plaintiff had a reasonable, good faith belief that there were grounds for a claim of discrimination or harassment, the success or failure of a retaliation claim is analytically divorced from the merits of the underlying discrimination or harassment claim. See Foster v. Time Warner Entm't. Co., 250 F.3d 1189, 1195 (8th Cir. 2001) (stating that a retaliation plaintiff "'need not establish the conduct which she opposed was in fact discriminatory but rather must demonstrate a good faith, reasonable belief that the underlying conduct violated the law'") (quoting Buettner, 216 F.3d at 714); see also, Buettner, 216 F.3d at 714 ("A finding of unlawful

retaliation . . . is not conditioned on the merits of the underlying discrimination complaint.").[1]

We apply the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), to analyze retaliation claims. See, e.g., Grey v. City of Oak Grove, 396 F.3d 1031, 1034 (8th Cir. 2005) (applying the burden shifting framework to analyze a retaliatory discharge claim under the Fair Labor Standards Act). The ultimate question in any retaliation case is whether the employer's adverse action against the employee was motivated by retaliatory intent. Accordingly, the shifting of intermediate evidentiary burdens under McDonnell Douglas is merely an analytical tool that "serves to bring the litigants and the court expeditiously and fairly to this ultimate question." Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). The ultimate burden of proof or persuasion to show that the employer's conduct was motivated by retaliatory intent remains at all times on the plaintiff. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).

To succeed under this analytical framework, the plaintiff must first present evidence sufficient to establish a prima facie case. Hesse v. Avis Rent A Car Sys.,

---

[1]As referenced by the dissent in Haas, if a plaintiff's underlying claim is frivolous, a reasonable fact finder could infer that the plaintiff knew the claim was frivolous and that the plaintiff did not bring the claim in good faith, but merely raised the underlying claim as a device to prevent or delay an anticipated adverse action. Cf. Mesnick v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991). In such a case, the failure of the underlying claim would necessarily be intertwined with evidence of a pre-existing basis for the adverse action, and therefore, not be analytically severable from the claim of retaliation or the employer's proffered reason for the termination. Although dismissed on summary judgment, the allegations of harassment in the present case clearly do not fall into this narrow category of frivolous claims. In this case Mr. Kjar admitted that the phone and cartoon incidents occurred and did not deny that the references to Ms. Wallace's body occurred. As a result, the failure of Ms. Wallace's underlying claims has no bearing on our analysis of the retaliation claim in this case.

Inc., 394 F.3d 624, 632 (8th Cir. 2005). There are three elements to a prima facie retaliation case. The plaintiff must demonstrate that he or she took part in protected conduct, that he or she was subjected to an adverse employment action, and that there exists a causal nexus between the protected conduct and the adverse action. Id. The plaintiff's burden at the prima facie case stage of the analysis is not onerous, and "[a] minimal evidentiary showing will satisfy this burden of production." Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 850 (8th Cir. 2005) (quoting Pope v. ESA Serv., Inc., 406 F.3d 1001, 1007 (8th Cir. 2005)).

It is undisputed that Ms. Wallace took part in protected conduct and that the Company took adverse action against her. Mr. Mierendorf admits that he made the decision to terminate Ms. Wallace's employment only fifteen days after her report of harassment. The actual termination occurred twenty-eight days after her report. For the purpose of our analysis, the conceded date of the decision to terminate rather than the date of actual termination is critical. This is because the inference of a cause and effect relationship between the protected conduct and the adverse action relates to the employer's motivations for the action rather than its method or timing in the execution of the action. See Kipp v. Missouri Highway and Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) ("what is meant by causal link . . . is a showing that an employer's retaliatory motive played a part in the adverse employment action") (internal quotation marks omitted).

"An inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." Peterson v. Scott County, 406 F.3d 515, 524 (8th Cir. 2005) (internal citations omitted). In Peterson, we held that a termination two weeks after a claim of discrimination was "close enough to establish causation in a prima facie case." Id. at 525. Based on Peterson, with an almost identical time frame, we believe that the timing in this instance strongly supports an inference of causation for the purpose of

-12-

the prima facie case. We need not rely solely on timing, however, because in this case other evidence lends support to an inference of causation. That evidence includes Mr. Mierendorf's comments that reflected animus, inconsistent application of the policy restricting transfers, and the isolated nature of Ms. Wallace's termination when compared to the widespread impact on the Company's business caused by the September 11, 2001 attacks. This evidence, taken together, is more than adequate to support an inference of causation and complete Ms. Wallace's prima facie case.

Because Ms. Wallace set forth a prima facie case, a presumption of retaliation arose and the burden of production shifted to the Company to articulate a legitimate, non-retaliatory reason for the adverse action. Buettner, 216 F.3d at 714. The Company identified a post-September 11, 2001 downturn in revenue coupled with overstaffing at the management level in Kansas City as a non-retaliatory reason for the termination of Ms. Wallace's employment. The Company, therefore, met its burden at this second stage and rebutted the presumption of retaliation. Burdine, 450 U.S. at 255.

Ms. Wallace was left with "the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." Id. The Supreme Court has recognized that, at this final stage of the burden shifting analysis, the plaintiff's burden "merges with the ultimate burden of persuading the court that she has been the victim of intentional [retaliation]." Id. (discussing the burden shifting analysis in the context of a discrimination claim). In making a showing at this final stage, evidence used to support the prima facie case is considered along with other evidence before

the court to determine whether there exists a triable fact on the ultimate issue of retaliation. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148 (2000).[2]

There are at least two routes by which a plaintiff may demonstrate a material question of fact at this final stage of the analysis. First, a plaintiff may succeed "indirectly by showing that the employer's proffered explanation is unworthy of credence," <u>Burdine</u>, 450 U.S. at 256, because it has "no basis in fact." <u>Smith v. Allen Health Sys., Inc.</u>, 302 F.3d 827, 834 (8th Cir. 2002). Second, a plaintiff may succeed "directly by persuading the court that a [prohibited] reason more likely motivated the employer." <u>Burdine</u>, 450 U.S. at 256. Both of these routes, in effect, amount to a showing that the prohibited reason, rather than the proffered reason, actually motivated the employer's action.

The first route, directly rebutting the proffered reason as false, usually involves more than a rebuttal of the employer's ultimate claims regarding its subjective motivations. It typically involves a broader rebuttal of the employer's underlying factual claims. <u>See, e.g.</u>, <u>Reeves</u>, 530 U.S. at 147 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."). Ms. Wallace's concessions regarding overstaffing at the management level and reduced revenue at the Kansas City International Airport location demonstrate that she does not contest the underlying facts as set forth by the Company to describe business conditions. Clearly then, in this case, the employer's explanation is at least "worthy of credence," <u>Burdine</u>, 450 U.S. at 256, and is not without "basis in fact." <u>Smith</u>, 302 F.3d at 834.

---

[2]As the Court made clear in <u>Reeves</u>, a strong prima facie case coupled with proof of pretext may suffice to create a triable question of fact. <u>Id.</u> ("Thus, a plaintiff's prima facie case, combined with sufficient evidence to find the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

Ms. Wallace's concessions, however, do not address the ultimate question of whether the proffered reason served as the actual basis for the adverse action.

The second route, in contrast, does not necessarily involve disproving the underlying factual claims of the employer. It focuses instead on rebuttal of the employer's ultimate factual claim regarding the absence of retaliatory intent. See Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1017-18 (8th Cir. 2005) ("[W]e have long recognized that a genuine issue of fact regarding unlawful employment [retaliation] may exist notwithstanding the plaintiff's inability to directly disprove the defendant's proffered reason for the adverse employment action."). Success under this route is dependant on showing that sufficient evidence of intentional retaliation exists for a jury to believe the plaintiff's allegations and find that the proffered explanation was not the true motiving explanation. See Buettner, 216 F.3d at 717 (stating that a plaintiff "must adduce enough admissible evidence to raise genuine doubt as to the legitimacy of a defendant's motive, even if that evidence does not directly contradict or disprove a defendant's articulated reasons for its actions"); Strate, 398 F.3d at 1017 ("'pretext' [is] shorthand for indicating that a defendant's proffered . . . explanation . . . is a pretext for unlawful discrimination, not that it is merely false in some way"); Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 946 n.8 (8th Cir. 1994) (same). In effect, a plaintiff may concede that the proffered reason, if truly the motivating cause for the termination, *would have been* a sufficient basis for the adverse action while arguing that the employer's proffered reason was not the true reason for the action. See, e.g., Hitt v. Harsco Corp., 356 F.3d 920, 924 (8th Cir. 2004) (stating that whether an age discrimination plaintiff could show pretext turned "on whether age was . . . the true reason for, the decision to terminate").[3]

_____

[3]Nothing in today's opinion should be construed to dilute the "determinative factor" standard set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 242 (1989) and reaffirmed in Norbeck v. Basin Elec. Power Coop., 215 F.3d 848, 852 (8th Cir. 2000). We hold only that a triable question of fact may still exist as to impermissible retaliation when an employee concedes that the proffered justification would have

The facts that Ms. Wallace relies upon to show intentional retaliation and to show that the Company's explanation was pretextual may be grouped as follows: (1) timing issues, (2) issues related to the Company's policy restricting transfers, (3) supervisors' comments that reflected animus, and (4) the Company's change in its explanation for the termination. We address these facts in turn.

A.    Timing Issues

The Company argues that temporal proximity, standing alone, is insufficient to prove retaliatory intent. While this is generally true, see Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999), any consideration of the impact of temporal proximity "standing alone" tends to be unhelpful. We cannot presume that fact finders view each piece of evidence in isolation, and most cases that involve claims of retaliation stem from rich factual backgrounds that provide ample evidence to support and/or disprove allegations of retaliation. In all such cases, the evidence of pretext and retaliatory intent must be viewed in its totality. Viewed within the context of the overall record, temporal proximity may directly support an inference of retaliation, and it may also affect the reasonableness of inferences drawn from other evidence.

Here, because only fifteen days elapsed between Ms. Wallace's report of harassment and Mr. Mierendorf's decision to fire her, temporal proximity provides strong support for an inference of retaliatory intent. Peterson, 406 F.3d at 525. This is particularly true in light of the fact that the business conditions cited by the Company had existed for a number of months before Ms. Wallace made her report of harassment. Where an employer tolerates an undesirable condition for an extended period of time, an employee takes part in protected conduct, and shortly thereafter, the

been valid *if* it had been the employer's true motivation. This is simply another way of stating that general agreement as to background facts does not necessarily eliminate questions of fact on the ultimate issue of subjective intent.

-16-

employer takes an adverse action in purported reliance on the long-standing undesirable condition, a reasonable jury can infer that the adverse action is based on the protected conduct. See Eliserio v. United Steelworkers of America Local 310, 398 F.3d 1071, 1079-80 (8th Cir. 2005) (stating that when an employer ignored or treated as de minimis five complaints about an employee but took drastic action following a sixth, identical complaint, a reasonable jury could infer that the employer's claim of reliance on the sixth complaint was pretextual and that the employer had acted in retaliation for the employee's intervening protected conduct). A fact finder could reasonably infer that, if business conditions alone had been the true motivation for Ms. Wallace's termination, the Company would have fired her at an earlier date and her termination would not have followed so closely on the heels of her report of harassment.

Also, when viewed against this time frame, a reasonable jury could find support for an inference of retaliation based on the lack of evidence to show that supervisors had considered Ms. Wallace's termination before her report of harassment. In this regard, we note that Mr. Mierendorf and Mr. Duffy claimed that they had previously discussed the general issue of manager overstaffing and lay-offs. These claims, however, were undocumented, and a finder of fact could infer that the purported loss of data by supervisors at two levels calls into doubt the truth of their claims. Further, the fact that there was an extra station manager at the location and the fact that the supervisors had encouraged Mr. Lovelace to apply for a transfer do not demonstrate that these supervisors had discussed or considered terminating Ms. Wallace prior to her complaint of harassment.

Another timing issue relates to the isolated nature of Ms. Wallace's termination, eight months after the terrorist attacks, when compared to other terminations at the Company purportedly linked to September 11. As described above, Ms. Wallace was the only management employee in the Midwest Region actually terminated due to the downturn in business. Also, she was the only Midwest employee actually terminated

in 2002. A finder of fact need not reject the factual assertion that there was a general downturn in business to infer that Ms. Wallace's termination, as a relatively isolated event, was motivated by retaliatory animus rather than by the broad economic concerns cited by the Company.

B. Transfer Policy

Regarding the Company's transfer policy, a reasonable jury could infer that Mr. Mierendorf and Mr. Kjar knew that the policy was discretionary and/or not applicable based on the facts of Ms. Wallace's case. Mr. Kjar himself received a transfer under Mr. Mierendorf's authority at a time when Mr. Kjar should have been barred under the policy, if the policy actually applied in the mandatory way claimed by Mr. Kjar and Mr Mierendorf. Also, Mr. Mierendorf encouraged Mr. Lovelace to apply for a transfer at a time when a transfer would have been barred under the Company's policy. Both of these examples, combined with the outstanding question of fact regarding characterization of the contents of Ms. Wallace's personnel file, suggest that Mr. Mierendorf knew the policy did not actually bar Ms. Wallace from receiving a transfer. Viewed in a light most favorable to Ms. Wallace, a reasonable jury could find Mr. Mierendorf's adverse and selective application of the policy to be evidence that his reliance on the policy was merely pretext to hide a retaliatory motive. The Company's refusal to consider Ms. Wallace for rehire after Ms. Lovelace's termination further strengthens this inference

The Company argues that we may not consider the denial of a transfer or a refusal to rehire because Ms. Wallace did not check the continuing action box on her EEOC complaint and because she stated that the first and last day of discrimination occurred on May 6, 2002, the date of her termination. The Company's arguments are misplaced for two reasons.

First, the Company misconstrues the nature of Ms. Wallace's reliance on the denial of a transfer and the failure to rehire. She does not argue that she has separate retaliation claims based on separate adverse actions. Rather, she argues that the subsequent facts provide evidence of the Company's motivation for her earlier termination. She clearly claimed only one retaliatory act. We have never held that evidence of retaliatory motive for action on a fixed date is limited to evidence that existed on that date or evidence that existed before a date listed on an EEOC form. Here, with the issue of retaliatory intent in play, it is reasonable, in fact expected, that the Company's post-termination actions would be relevant to assessing the veracity of claims of economic necessity. In effect, the Company argues that the EEOC form serves to make evidence that followed May 6, 2002, infirm or irrelevant. We find no support for this position.

Second, the Company construes our precedent regarding the restrictive effect of an EEOC filing too narrowly. We have held that claims based on an EEOC charge must "grow out of" or be "like or reasonably related to" the claim stated in the EEOC charge. Wentz v. Maryland Cas. Co., 869 F.2d 1153, 1154 (8th Cir. 1989). The information contained in an EEOC charge must be sufficient to give the employer notice of the subject matter of the charge and identify generally the basis for a claim, but it need not specifically articulate the precise claim or set forth all the evidence an employee may choose to later present in court. EEOC v. Delight Wholesale Co., 973 F.2d 664, 668 (8th Cir. 1992) ("The permissible scope of an EEOC lawsuit is not confined to the specific allegations in the charge; rather, it may extend to any discrimination like or related to the substance of the allegations in the charge and which reasonably can be expected to grow out of the investigation triggered by the charge."). See also, Nichols v. Am. Nat'l Ins. Co., 154 F.3d 875, 886-87 (8th Cir. 1998) ("In determining whether an alleged discriminatory act falls within the scope of a Title VII claim, the administrative complaint must be construed liberally 'in order not to frustrate the remedial purposes of Title VII.'") (quoting Cobb v. Stringer, 850 F.2d 356, 359 (8th Cir. 1988)).

## C.    Supervisor's Comments

The evidence just discussed must be viewed against the backdrop of Mr. Mierendorf's comments. Had the uncertainty surrounding the transfer policy occurred in a vacuum, then it might not be reasonable for a jury to infer retaliatory intent. Here, however, the temporal proximity and the supervisor's comments make such an inference justifiable. Mr. Mierendorf was displeased that Ms. Wallace had gone over Mr. Kjar's head. Also, Mr. Mierendorf stated that he thought her report of harassment would put a muzzle on kidding that he considered beneficial in the workplace. These comments are not general, offhand comments by a coworker. Rather, they are comments from a supervisor, specific to Ms. Wallace, specific to the off-color humor she complained about, and specific to the impact of Ms. Wallace's report on the future environment of the workplace. Taken as a whole, we believe that this evidence is sufficient for a reasonable fact finder to conclude that the Company terminated Ms. Wallace because of her report of harassment and that the proffered explanation was merely an after-the-fact explanation for actions that truly grew from a retaliatory intent. Hitt, 356 F.3d at 924 (stating that whether an age discrimination plaintiff could show pretext turned "on whether age was. . . the true reason for, the decision to terminate").

## D.  Shifting Explanations

Finally, we note that the Company's position has not been consistent throughout these proceedings or the time surrounding Ms. Wallace's termination. Prior to Ms. Wallace's report of harassment, Mr. Mierendorf had encouraged her to apply for a transfer to Kentucky. There was no evidence of dissatisfaction with Ms. Wallace's performance, other than the written record of a verbal warning, as discussed above. Also, Mr. Mierendorf claimed reliance on a policy that mandated consideration of seniority to the exclusion of other factors, including performance. At her termination, no one from the Company suggested that performance factored

-20-

into the termination decision. Nevertheless, in these proceedings, the Company raises performance issues as a make-weight and non-retaliatory motive for Ms. Wallace's termination. As another make-weight and non-retaliatory motive, the Company notes that it saved itself from paying Ms. Wallace certain benefits by terminating her employment just short of an anniversary that would have caused those benefits to vest. While these factors might provide evidence of a non-retaliatory motive, a jury could reasonably infer that the Company's after-the-fact reliance on these facts is evidence that the Company is dissembling to cover up an impermissible motive. See Kobrin v. Univ. of Minn., 34 F.3d 698, 703 (8th Cir. 1994) ("Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext.").

While a jury certainly need not resolve the factual issue of retaliatory intent in favor of Ms. Wallace, we believe that it reasonably could. As such, summary judgment is inappropriate, and Ms. Wallace is entitled a jury trial on her retaliation claim.

We reverse the judgment of the district court and remand for proceedings consistent with this opinion.

COLLOTON, Circuit Judge, dissenting.

This case presents a plaintiff, Terri Wallace, who was laid off from her position as a manager at an airport rental car station. It is undisputed that the employer, Dollar Rental Car ("Dollar"), advised her at the time of the lay-off that the action was taken because the company had experienced a downturn in revenue at her location, there were too many managers at her location, and she was the least senior of the one-too-many managers. Wallace now *concedes* that, indeed: (1) the events of September 11, 2001, greatly affected the travel industry, including car rental agencies, (J.A. at 66-67; *see also id.* at 45, ¶ 27); (2) there was a downturn in the revenue at her location at the

-21-

time of her layoff, (*id.* at 68); (3) four managers at her location were too many, particularly in light of the downturn of business since September 11, (*id.* at 68); and (4) she was the least senior of the four managers at her location. (*Id.* at 76). There is likewise no genuine dispute that the employer promulgated lay-off procedures on September 21, 2001, providing that "[f]or field locations, layoffs must be based upon the employee's seniority." (*Id.* at 96). Under those circumstances, the district court ruled that there was no genuine issue of fact concerning whether the plaintiff was laid off for a legitimate business reason, and dismissed the complaint.

The plaintiff claims, nonetheless, that she was terminated in retaliation for making a complaint of sexual harassment.[4] The governing statute prohibits discrimination against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Wallace does not claim to have opposed an employment practice that was actually unlawful, but our court has held that the statute also encompasses opposition to practices that are not unlawful, if an employee acted based on a good faith, objectively reasonable belief that the practices were unlawful. *Evans v. Kansas City, Mo. Sch. Dist.*, 65 F.3d 98, 100 (8th Cir. 1995); *cf. Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (per curiam) (noting that Supreme Court had no occasion to rule on propriety of this interpretation). Dollar does not argue that Wallace's report of Brad Kjar's behavior was outside the scope of opposition protected by the statute. *Cf. Breeden*, 532 U.S. at 271.

Wallace's retaliation claim is thus considered under the traditional burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Cronquist v. City of Minneapolis*, 237 F.3d 920, 926 (8th Cir. 2001).

---

[4]There is no claim on appeal that Wallace was actually a victim of sexual harassment. The district court dismissed Wallace's allegation of sexual harassment, concluding as a matter of law that she failed to establish that Brad Kjar's conduct created a hostile work environment actionable under Title VII.

Assuming the plaintiff has made a prima facie case, she must then present evidence sufficient to show that Dollar's proffered reason for her lay-off was a pretext for discrimination, and that the company's alleged discriminatory motive was determinative in the decision to effect the lay-off. *Id.*; *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).[5] Dollar is not liable, therefore, unless the evidence shows that but for an alleged desire to retaliate against Wallace for reporting Kjar's behavior, Dollar would have continued to employ an extra manager that Wallace concedes was not justified as a matter of sound business management. *See Miller v. CIGNA Corp.*, 47 F.3d 586, 595-96 (3d Cir. 1995) (en banc). Where the plaintiff advances a claim that "simply makes no economic sense," the plaintiff must "come forward with more persuasive evidence to support [her] claim than would otherwise be necessary." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Fender v. Bull*, 437 F.3d 770, 775 (8th Cir. 2006); *Bator v. Hawaii*, 39 F.3d 1021, 1026 (9th Cir. 1994). The court's opinion offers no persuasive reason to conclude that absent Wallace's report about Kjar, Dollar would have followed an unsound business practice and continued to fill an unnecessary position at the Kansas City airport.

The court cites the correlation of timing between the plaintiff's complaint and the lay-off, a factor that we have said repeatedly is generally insufficient to make even a prima facie case of retaliatory motive. *Gagnon v. Sprint Corp.*, 284 F.3d 839, 851 (8th Cir. 2002); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999); *Nelson v. J.C. Penny Co., Inc.*, 75 F.3d 343, 346-47 (8th Cir. 1996); *but cf. Peterson*

---

[5]The Civil Rights Act of 1991 amended Title VII to provide that a plaintiff establishes an unlawful employment practice when she "demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). This amendment does not affect the analysis here, because it does not apply to retaliation claims under Title VII. *Norbeck v. Basin Elec. Power Coop.*, 215 F.3d 848, 852 (8th Cir. 2000).

*v. Scott County*, 406 F.3d 515, 524-25 (8th Cir. 2005). Nonetheless, the court finds these precedents "unhelpful," and says that temporal proximity alone actually provides "strong support" for the claim that the conceded legitimate reason for Wallace's layoff was really a pretext for discrimination. *Ante*, at 16. The court relies on its view that the "business conditions cited by the Company had existed for a number of months before Wallace made her report" concerning Kjar.

The precise condition that led to the layoff of Wallace, however, did not exist for several months before the employment action. The supervisor, Tom Mierendorf, had hoped to avoid a lay-off by arranging to promote one of the extra managers at the Kansas City location, but in April 2002, this manager, Mark Lovelace, performed inadequately during a trial management opportunity in Louisville. (J.A. at 322-23). Dollar thus "realized that Mark Lovelace was not going to be leaving any time soon," (*id.* at 336), and the company was left with the "business condition" that necessitated a layoff – one manager too many, with no prospect of an impending departure to resolve the problem. (*Id.* at 209, 322, 336). This circumstance led Dollar's vice president for operations, Jim Duffy, in consultation with Mierendorf, to conclude that a lay-off was necessary. (*Id.* at 190, 209, 336). Mierendorf testified that the possibility of a lay-off had been under consideration for months before Wallace's report of Kjar's behavior, but that the ultimate decision to reduce the workforce was made "right after Louisville," that is, right after Lovelace was deemed unready for a promotion. (*Id.* at 332). "[T]he simple fact that the employer's testimony is necessarily self-interested" is not "enough under our previous cases to allow the jury to find that the employer's proffered reasons were pretextual." *Nelson*, 75 F.3d at 346.

The court also finds it significant that the plaintiff was the only manager laid off in the Midwest region in 2002, but the evidence presented was that other stations were able to reduce staff through attrition or reduction of non-management employees, and at least one departing manager was not replaced. (J.A. at 313-17,

339). Most important, there was *no* evidence that other stations retained managers that everyone – employee and employer alike – agreed were excessive. The absence of layoffs in stations that were not shown to be overstaffed does not support an inference of retaliatory motive.

Although Wallace made no claim that she was denied an opportunity to transfer based on retaliatory motive, the court concludes that the company's failure to provide an opportunity to transfer supports a finding of discriminatory motive for the lay-off. There is a logical disconnect, however, between Wallace's argument regarding a transfer and the disputed lay-off. Wallace contends that the company treated her differently than it might have treated another person who was laid off and sought to transfer. But even if true, this in no way undermines Dollar's explanation that the *underlying lay-off* occurred because of overstaffing in Kansas City. Having failed to bring an action alleging a retaliatory refusal to transfer, Wallace cannot now bootstrap an abandoned claim into an entirely separate allegation concerning the company's decision to reduce its workforce at the Kansas City Airport.

Snippets of testimony from supervisor Mierendorf also do not make this a submissible retaliation case. Mierendorf never objected to Wallace opposing Kjar's behavior. To the contrary, Mierendorf testified that "[s]he has the right to make someone stop," (J.A. at 335), that it was "appropriate" for Wallace to report the matter to him rather than to Kjar, (*id*. at 331), and that he had "no problem" with her approaching him directly. (*Id*. at 336). Mierendorf himself assured Wallace in writing on the very date of her initial report that there "cannot be retribution" for the report, and that he would "make Brad [Kjar] very clear on that." (*Id*. at 87). Mierendorf merely expressed disappointment that communication within his Kansas City office had failed, because Wallace and Kjar could not resolve the situation through informal discussions, even though five months had passed between the date of the incidents and Wallace's report. (*Id*. at 336). Mierendorf felt no sympathy for Kjar, because he "caused an event to occur," and Mierendorf's regret that the

-25-

atmosphere of the workplace might become more tense and less lively was a comment on the entire "situation" – *i.e.*, Kjar's inappropriate behavior and the breakdown of communication in the Kansas City office – not on Wallace's decision to make a report. (*Id.*).

But even assuming, for the sake of argument, that Mierendorf's comments reasonably could be read as indicating displeasure that Wallace had opposed Kjar's conduct, this inference would not demonstrate that Dollar's legitimate explanation was pretextual. At most, it would show that Mierendorf's allegedly improper motive coincided with the company's legitimate motive to eliminate overstaffing, a circumstance that is insufficient to state a retaliation claim under Title VII, unless the improper motive had a determinative influence on the outcome. *See Miller*, 47 F.3d at 597 & n.9. What is lacking on this record is evidence that Dollar would not have acted to reduce its workforce for economic reasons that everyone agrees dictated a reduction. Viewed in light of Dollar's uncontested non-discriminatory rationale, Mierendorf's comments do not constitute the sort of "substantial evidence" of pretext that would permit a reasonable inference that discriminatory intent by the company was determinative in the employment decision. *See Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003) (to defeat motion for summary judgment, facts and circumstances relied upon by plaintiff "must attain the dignity of substantial evidence").

It is further asserted that the employer has given "shifting explanations" for the layoff, *ante*, at 20, but Dollar has maintained consistently since the date of the employment action that Wallace was laid off because the station had too many managers, and she was the least senior manager. The employer's reference to the vesting of the plaintiff's benefits was simply a response to the *plaintiff's* argument that raised the topic: "Plaintiff failed to present evidence that defendant's reason was pretextual, admitted the reason was true and, in fact, articulated an additional non-retaliatory reason for her own layoff alleging in her Petition that she was 'informed that she was being laid off one day before her benefits vested.'" (Appellee's Br. at

19). Similarly, the plaintiff's performance was not offered as a reason for *the lay-off*; it was discussed in response to the plaintiff's entirely different argument (not raised in her complaint or EEOC charge) that the company impermissibly failed *to transfer* her to another location.

The parties agree that the business reason stated for Dollar's employment action was entirely legitimate and dictated by business economics. The reason was determined and articulated at the time of the lay-off; it was not an "after-the-fact explanation." *Cf. ante*, at 20. The evidence does not support the uneconomic conclusion that but for the employee's report of unprofessional workplace behavior by a colleague, Dollar would have retained an unnecessary employee. I would therefore affirm the judgment of the district court.

_____